BOB MAXFIELD, INC., d/b/a Bob Maxfield American, et al., Plaintiffs-Appellants,

and

William Fraker and Aileen Fraker, Plaintiffs-Cross Appellees,

v.

AMERICAN MOTORS CORPORATION et al., Defendants-Third Party Plaintiffs-Appellees-Cross Appellants,

v.

James R. MAXFIELD, III, et al., Third Party Defendants-Appellants-Cross Appellees.

No. 79–2150.

United States Court of Appeals, Fifth Circuit. Unit A

Feb. 23, 1981. Rehearing Denied March 23, 1981.

Jack N. Price, P. C., Austin, Tex., for Maxfield et al.

James C. Slaughter, Houston, Tex., for American Motors et al.

Brantly Harris, Stephen Weeks, Houston, Tex., for William Fraker et al.

Before WISDOM, GARZA and REAVLEY, Circuit Judges.

WISDOM, Circuit Judge:

This is an action for damages brought under section 1 of the Sherman Act, 15 U.S.C. § 1 (1976); section 3 of the Clayton Act, *id.* § 14; and the Automobile Dealers Act, *id.* §§ 1221–1225. There are also counterclaims, cross-claims, and third party complaints arising out of notes and guaranties made by the plaintiff and its principals. At the close of a jury trial, the district court granted a directed verdict for the defendants on all of the plaintiff's claims. In a separate bench trial, the court granted judgment for the defendants on their counterclaims. On appeal, the plaintiff asserts several errors: (1) the district court abused its discretion in refusing to permit the plaintiff to amend its complaint; (2) the directed verdicts on the antitrust and Dealers Act charges were improper; (3) the trial judge improperly excluded certain testimony offered by the plaintiff; and (4) the judgment on the counterclaim was improper under Texas law. We affirm the judgment of the district court in all respects as to the plaintiff's antitrust and Dealers Act complaint. We remand the judgment on the claims for indebtedness, however, for a new determination of the amount of the award.

This case concerns the unhappy relationship between American Motors Corporation ("AMC"), a major auto manufacturer, and Bob Maxfield, Inc., one of AMC's retail dealers in the Houston area.[1] Maxfield opened business as an AMC dealer in March 1972. In May 1973 AMC terminated Maxfield's franchise and took over operation of the dealership.

Disputes with AMC marred Maxfield's tenure as a dealer almost from the start.[2] AMC provided Maxfield with an initial inventory of parts; Maxfield could return unneeded stock for full credit within 90 days. Maxfield alleges that AMC urged it to keep the parts for another 90 days, promising to take them back at the end of that time. AMC, it says, reneged on the promise. AMC denies having made the promise. Again, Maxfield alleges that AMC wrongfully delayed giving it permission to install certain lubricating equipment leased from another company.

By far the most important source of friction, however, was the problem of product mix in the line of cars AMC sold to Maxfield. During 1972 and 1973 AMC made two lines of small cars, the Gremlin and the Hornet. These models were very popular—

---

1. The original plaintiff in the antitrust and Dealers Act suit is Bob Maxfield, Inc., a corporation owned by Bob Maxfield and his business backer, William Fraker. The defendants are AMC, its subsidiaries American Motors Sales Corp. and American Motors Realty Corp., and Memorial Bank of Houston. Memorial Bank counterclaimed against Bob Maxfield, Inc. for indebtedness. It also cross-claimed against American Motors Sales and impleaded Bob Maxfield, William Fraker, and their wives, Sondra Maxfield and Aileen Fraker, all of whom guaranteed the debt of Bob Maxfield, Inc. American Motors Sales cross-claimed against the Maxfields and the Frakers on the guaranty.

The trial judge granted the Bank's motion for a directed verdict at the close of evidence in the antitrust and Dealers Act trial. That ruling is not appealed.

We refer to all of the American Motors defendants collectively as "AMC". For purposes of the antitrust and Dealers Act issues, we refer to the plaintiff as "Maxfield" and to its principal as "Bob Maxfield".

2. There were numerous disputes between AMC and Maxfield that may have entered into AMC's decision to terminate the dealership. These concerned the plaintiff's failure to maintain its net working capital at the required $200,000 sum, submission of allegedly false financial statements which inflated the net working capital, poor sales performance, financial problems, and personnel problems. Maxfield does not complain about the termination.

so much so that AMC suffered a nationwide supply shortage and rationed the cars among its dealers. At the same time, AMC's two models of large cars, the Ambassador and the Matador, were considerably less successful on the retail market. The heart of Maxfield's complaint is that AMC made it take large cars that it did not want and could not sell in order to obtain the small cars it needed. AMC, it alleges, made peremptory demands and used hard-sell salesmanship to get Maxfield to take the "full line" of AMC cars. AMC promised to take back unsold big cars and then broke the promise. Finally, when Maxfield refused to cooperate, allegedly, AMC retaliated by cutting back Maxfield's supply of small cars. AMC denies that there was any coercion, deceit, or discrimination.

### I. Denial of Leave to File Third Amended Complaint

The original complaint and first amended complaint in this case were filed on July 24, 1973, and February 11, 1974, respectively. Both alleged the same antitrust violation: an illegal tie-in arrangement, in violation of section 1 of the Sherman Act and section 3 of the Clayton Act. The second amended complaint, filed November 7, 1975, added allegations of "full-line forcing", in violation of those same sections, and an attempt to monopolize through a dual distribution system, in violation of section 2 of the Sherman Act.

On April 7, 1977, about a month before the trial date and nearly four years after the commencement of the suit, Maxfield sought leave to file a third amended complaint, adding an allegation of illegal exclusive dealing. The basis for the new allegation was the provision in Maxfield's franchise agreement prohibiting it from obtaining a dealership from any other auto manufacturer.

■■■■ The mere existence of an exclusive dealing clause in a contract does not establish an antitrust violation. As the Supreme Court has held,

> [E]ven though a contract is found to be an exclusive dealing arrangement, it does

not violate [section 3 of the Clayton Act] unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected.

*Tampa Electric Co. v. Nashville Coal Co.*, 1961, 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580, 586–87. To determine whether the foreclosed competition is "substantial", the court must look at "the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein". *Id.*, 365 U.S. at 329, 81 S.Ct. at 629. The court must also determine the relevant line of commerce and geographic market. *Id.*, 365 U.S. at 327–28, 81 S.Ct. at 627–28.

AMC opposed Maxfield's motion, pointing out that this was the first time in the suit that Maxfield had asserted any injury resulting from its inability to do business with other auto manufacturers. Because the proposed amendment was filed only one month before the trial, AMC had no opportunity to conduct discovery on any of the points mentioned in *Tampa Electric*. In particular, AMC had not undertaken any discovery as to whether Maxfield would have sought another dealership but for the franchise clause and, if so, whether it could have obtained one and at what cost. Yet if Maxfield were to show any effect on competition, it would have had to show at least some likelihood that it would have sought and obtained a dealership from one of AMC's competitors. In these circumstances, the district court did not abuse its discretion in refusing to allow the tardy amendment. Fed.R.Civ.P. 15(a); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 1971, 401 U.S. 321, 330–31, 91 S.Ct. 795, 802, 28 L.Ed.2d 77, 87–88; *Wealden Corp. v. Schwey*, 5 Cir. 1973, 482 F.2d 550, 552; *Nevels v. Ford Motor Co.*, 5 Cir. 1971, 439 F.2d 251, 257; *Jones v. Metzger Dairies*, 5 Cir. 1964, 334 F.2d 919, 925–26, *cert. denied*, 379 U.S. 965, 85 S.Ct. 659, 13 L.Ed.2d 559 (1965).

## II. The Antitrust Directed Verdict

Maxfield's antitrust case relies on two theories: an illegal tie-in, in violation of section 1 of the Sherman Act, and an illegal full-line forcing policy, in violation of section 3 of the Clayton Act.[3] The two theories of liability are substantively synonymous. *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 5 Cir. 1977, 553 F.2d 964, 976, *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); L. Sullivan, Handbook of the Law of Antitrust § 153 (1977). We have said that an illegal tying arrangement has four characteristics:

(1) two separate products, the tying product and the tied product;

(2) sufficient market power in the tying market to coerce purchase of the tied product;

(3) involvement of a not insubstantial amount of interstate commerce in the tied market; and

(4) anticompetitive effects in the tied market.

*Driskill v. Dallas Cowboys Football Club, Inc.*, 5 Cir. 1974, 498 F.2d 321, 323.

The trial judge properly granted AMC's motion for a directed verdict on this charge because Maxfield presented no evidence that AMC used any coercion to force it to accept Ambassadors and Matadors. We have held that actual coercion is an indispensable element of a tie-in charge. A manufacturer may use strong persuasion, encouragement, or cajolery to the point of obnoxiousness to induce his retailer to buy its full line of products. An antitrust violation occurs only if it goes beyond persuasion and coerces or forces its customer to buy the tied product in order to obtain the tying product. *Ogden Food Service Corp. v. Mitchell*, 5 Cir. 1980, 614 F.2d 1001, 1002;

*Response of Carolina, Inc. v. Leasco Response, Inc.*, 5 Cir. 1976, 537 F.2d 1307, 1327–28.[4]

We cannot see any evidence that AMC coerced Maxfield into taking unwanted large cars. Viewing the record in the light most favorable to Maxfield,[5] we can see that AMC's representatives tried vigorously to sell big cars to Maxfield. On numerous occasions they "informed" Bob Maxfield or his sales manager of the numbers of each model they wanted Maxfield to buy. They "persuaded" or "encouraged" Maxfield to take the suggested number of big cars, and they sometimes became angry when it refused. On one occasion an AMC representative ordered Ambassadors on Maxfield's behalf, without its consent. (Maxfield refused delivery.) Another time a representative talked Maxfield into taking big cars by promising to "move them away" if they did not sell—a promise not kept. AMC's policy was to persuade all of its dealers to take the full line, and there were strong job incentives for AMC management personnel to carry out that policy. What is entirely missing from this list of horrors, however, is any evidence that AMC ever *required* Maxfield to take large cars or face a cutoff of small cars. At most, there are two ambiguous, conclusory statements by Bob Maxfield and his sales manager suggesting that such a requirement existed—statements accompanied by admissions that no one ever made any actual threat to that effect. In twelve days of trial, Maxfield did not show one instance of any particular occurrence or statement showing an enforced requirement that it buy big cars. On the contrary, the record shows several instances in which Maxfield successfully resisted attempts to place big cars with it.

**3.** Maxfield's second amended complaint also alleged an attempt to monopolize retail sales. Maxfield does not appeal the district court's grant of directed verdict for AMC on that count.

**4.** In *Ogden Food* we noted that the coercion requirement does not apply in suits brought by third party competitors of a supplier who ties his products together. We reaffirmed the *Re-*

*sponse* rule as it applies in suits brought by a franchisee against his franchisor. 614 F.2d at 1002 n.3, citing *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 5 Cir. 1977, 553 F.2d 964, 978, *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978).

**5.** *Boeing Co. v. Shipman*, 5 Cir. 1969, 411 F.2d 365 (en banc).

From December 1972, when plaintiff refused Ambassadors, through May 1973, the last month of the plaintiff's tenure as a dealer, the plaintiff received only 5 Matadors and 5 Ambassadors, but also received 73 Gremlins and 38 Hornets, was invoiced for approximately 51 more in May, and was promised an additional 100 cars to be built in June and July.

Nor was there any evidence of an implied requirement backed by sanctions. Maxfield's case on this point is simple: after it refused to buy big cars, AMC started cancelling orders for small cars, leaving other orders unfilled, and delaying delivery. Here the missing piece is any causal connection between Maxfield's refusal to take the unwanted cars and AMC's reluctance to supply small cars. The weakness in Maxfield's argument is the fallacy, *post hoc ergo propter hoc.* In fact, according to AMC's uncontradicted evidence, the reason for Maxfield's difficulty in obtaining Gremlins and Hornets was that there was a nationwide shortage of them. No AMC dealer was receiving his full orders of small cars; indeed, the record shows, Maxfield fared better than most AMC dealers.[6]

### III. The Direct Verdict on the Automobile Dealers Act

■ Section 2 of the Automobile Dealers Act provides in part that:

> An automobile dealer may bring suit against any automobile manufacturer . . . and shall recover the damages by him sustained and the cost of suit, *by reason of the failure of said automobile manufacturer . . . to act in good faith* in performing or complying with any of the terms or provisions of the franchise, or in terminating, cancelling, or not renewing the franchise with said dealer.

15 U.S.C. § 1222 (1976) (emphasis added). By using a standard of "good faith", the Act seems on first reading to give a wider protection to dealers such as Maxfield than do the tie-in provisions of the antitrust laws. On closer examination, however, it is apparent that the Act means less than it purports to say, for it gives "good faith" a much narrower meaning than it has in ordinary legal usage. "Good faith" is defined in section 1(e):

> The term "good faith" shall mean the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party *freedom from coercion, intimidation, or threats of coercion or intimidation* from the other party: *Provided,* That recommendation, endorsement, exposition, persuasion, urging, or argument shall not be deemed to constitute a lack of good faith.

15 U.S.C. § 1221(e) (1976) (emphasis added). Accordingly, it is well established that actual coercion, intimidation, or threats are an essential element of a cause of action under the Act. *Southern Rambler Sales, Inc. v. American Motors Corp.*, 5 Cir. 1967, 375 F.2d 932, 935, *cert. denied,* 389 U.S. 832, 88 S.Ct. 105, 19 L.Ed.2d 92 (1967); *Woodard v. General Motors Corp.*, 5 Cir. 1962, 298 F.2d 121, 127, *cert. denied,* 369 U.S. 887, 82 S.Ct. 1161, 8 L.Ed.2d 288 (1962); *see* H.R.Rep.No. 2850, 84th Cong., 2d Sess. 9, *reprinted in* [1956] U.S.Code Cong. & Ad.News, pp. 4596, 4603.[7]

---

**6.** Consider, for example, the mysterious incident of the hundred Gremlins and Hornets. Only a few days after AMC took over Maxfield's dealership, AMC trucks delivered one hundred Gremlins and Hornets there, virtually wiping out the dealership's backlog of unfilled orders. One witness said he had never seen so many cars dumped on one lot at a single time before. Maxfield speculates, with no further factual support, that this proves AMC was holding back Maxfield's small cars, keeping them in some unknown storage field. On the contrary, AMC's uncontradicted evidence shows that this delivery was a result of Maxfield's urgent pleas for more small cars. About a month before termination, AMC responded to those pleas by promising to produce a hundred cars specially for Maxfield. There is no evidence whatsoever of any connection between the promise and delivery, on one hand, and the decision to terminate Maxfield's franchise, on the other.

**7.** *Accord, e. g., Sherman v. British Leyland Motors, Ltd.*, 9 Cir. 1979, 601 F.2d 429, 445; *Minson Plymouth, Inc. v. Chrysler Motors Corp.*, 4 Cir. 1977, 554 F.2d 1266 (per curiam); *Fray*

Maxfield's primary allegation under the Dealers Act is the same as its antitrust allegation: AMC coerced it into buying Ambassadors and Matadors it did not want. As we held with regard to the antitrust complaint, there is no substantial evidence that AMC used any coercion, intimidation, or threats against Maxfield to force it to take big cars.

Maxfield also contends that AMC violated the Act by three lesser sins: its wrongful delay in permitting Maxfield to install another manufacturer's lubrication equipment; its deceitful and unkept promise to take back an overstock of parts; and its deceitful and unkept promise to "move away" certain Ambassadors if Maxfield could not sell them. Assuming that AMC committed these acts (and even assuming that it did so in "bad faith" in the usual sense of the term), however, it is clear that these acts cannot be characterized as coercive, intimidating, or carrying threats. Accordingly, we hold that Maxfield presented no substantial evidence of coercion to support an allegation under the Dealers Act; the directed verdict for AMC was proper.

## IV. The Excluded Testimony

Maxfield sought to bolster its case on coercion by presenting testimony[8] by two former AMC dealers and a former AMC official concerning AMC's alleged attempts to force the two other dealers, Robert Semke and Robert Dilmore, to take unwanted cars. Such testimony is logically relevant to Maxfield's case, within the meaning of Fed.R.Ev. 401, because it bears on the likelihood that AMC exerted similar coercion against Maxfield. Nevertheless, we conclude that its exclusion was not error. Fed.R.Ev. 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Here, the probative value of the excluded testimony is small. Neither the record nor the excluded testimony contains any evidence of any national AMC policy of tying big cars to small cars. On the contrary, Maxfield's consistent theory throughout the case has been that particular AMC representatives acted to force it to take Ambassadors and Matadors. Neither of the two dealers were in the same sales region as Maxfield, and one sold his AMC dealership nearly ten years before Bob Maxfield started his. Neither dealt with the same AMC personnel. Maxfield did not call any of the 17 AMC dealers who had been in business in the Houston area from 1966 to 1976. On the other side of the balance, the possibility of confusion and waste of time is considerable. Admission of the testimony would have required collateral argument as to the merits of the two dealers' complaints. Moreover, AMC has seventeen dealers in the Houston area and more than two thousand nationally. Admission of the testimony would have impelled AMC to bring in evidence a large number of dealers who, AMC asserts, would corroborate its assertion of lack of coercion. In these circum-

---

Chevrolet Sales, Inc. v. General Motors Corp., 6 Cir. 1976, 536 F.2d 683, 685; *Lawrence Chrysler Plymouth, Inc. v. Chrysler Corp.*, 7 Cir. 1972, 461 F.2d 608, 610, *cert. denied*, 409 U.S. 981, 93 S.Ct. 317, 34 L.Ed.2d 245 (1972); *Autowest, Inc. v. Peugeot, Inc.*, 2 Cir. 1970, 434 F.2d 556, 561; *Hanley v. Chrysler Motors Corp.*, 10 Cir. 1970, 433 F.2d 708, 712; *Kotula v. Ford Motor Co.*, 8 Cir. 1964, 338 F.2d 732, 734, *cert. denied*, 380 U.S. 979, 85 S.Ct. 1333, 14 L.Ed.2d 273 (1965); *Globe Motors, Inc. v.*

*Studebaker-Packard Corp.*, 3 Cir. 1964, 328 F.2d 645, 646.

8. Only Robert Semke appeared to testify in person. His testimony was taken outside the presence of the jury. Maxfield sought to introduce depositions of Robert Dilmore and William Morgan. Semke's testimony and Dilmore's deposition were excluded entirely. Parts of Morgan's deposition, relating to Maxfield's dealings with AMC, were read into evidence, but the court excluded other parts deal-

stances it was no abuse of discretion to exclude this evidence.[9]

### V. The Counterclaim

Having disposed of Maxfield's claims under the antitrust laws and the Dealers Act, we now must address several issues relating to Memorial Bank's counterclaim. This portion of the case involves three sets of transactions. First, Bob Maxfield, Inc. issued a promissory note to the Bank in March 1972 for $150,000 plus interest, in consideration of the Bank's loan for Maxfield's original capitalization. Backing the note was a security agreement between the Bank and Bob Maxfield, Inc., and two guaranty agreements. One was signed by Bob Maxfield,[10] William Fraker, and their wives Sondra Maxfield and Aileen Fraker. The other was a guaranty or take-out letter from AMC. Second, the Bank extended a $600,000 line of credit to Bob Maxfield, Inc. to fund its "floor plan" or continuing inventory of cars. Bob Maxfield, Inc. issued a separate promissory note for each car or small set of cars. This floor plan debt was backed by a security agreement from Bob Maxfield, Inc. and by a guaranty agreement signed by the Maxfields and the Frakers. Third, in the spring of 1973 Bob Maxfield, Inc. had run up an overdraft of about $60,000. It issued a new promissory note to the Bank for $60,000, backed by a security agreement and an assignment to the Bank of all of Bob Maxfield, Inc.'s factory receivables from AMC.

At trial, the Bank recovered its outstanding deficiencies on all three debts, plus interest and contractual attorney's fees, from Bob Maxfield, Inc. It made a similar recovery on the capital note guaranty and floor plan guaranty from the Maxfields and the Frakers. AMC had already paid the Bank a large sum on its capital note guaranty, but the Bank recovered a judgment against AMC for the remainder on that note and for factory receivables payable to Bob Maxfield, Inc. and assigned to the bank. AMC recovered its capital note payment, as well as interest on the factory receivables, from Bob Maxfield, Inc. and the four individuals.

◼ **A.** *Maxfield's Setoffs.* The Maxfields and Bob Maxfield, Inc.[11] contend that the trial judge erroneously gave judgment for the whole amount of the debt, ignoring several thousand dollars in "setoffs". The setoffs include financial and physical assets of Bob Maxfield, Inc. seized by the Bank; assets seized by AMC when it took over the dealership; rent for the dealership facilities for the period between the takeover and the foreclosure; and unauthorized charges against Maxfield's parts account.

The Bank argues that the Maxfield parties may not raise these setoffs because they did not plead them as affirmative defenses. Fed.R.Civ.P. 8(c); *Chicago Great Western Ry. v. Peeler*, 8 Cir. 1944, 140 F.2d 865. It is not clear to us that these items are setoffs; arguably they bear directly on the amount of the debts outstanding. We need not decide that question, however, because the record shows that both the Bank and AMC consented to litigate these claims at trial. *See Dale Benz, Inc. v. American Casualty Co.*, 9 Cir. 1962, 303 F.2d 80, 84.

---

ing with Morgan's testimony in a civil suit brought by Dilmore.

**9.** Even if the exclusion of the testimony was erroneous, it was harmless. Maxfield presented no evidence that *it particularly* was coerced. Without that evidence, AMC was entitled to a directed verdict, even if Maxfield had shown a national tying policy. *See Ungar v. Dunkin' Donuts*, 3 Cir. 1976, 531 F.2d 1211, 1224–25, *cert. denied*, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976); *Halverson v. Convenient Food Mart, Inc.*, 1974, N.D.Ill., 69 F.R.D. 331, 335–36; *Abercrombie v. Lum's, Inc.*, 1972, S.D. Fla., 345 F.Supp. 387, 391; *Lah v. Shell Oil Co.*, 1970, S.D.Ohio, 50 F.R.D. 198.

**10.** Bob Maxfield's full name is James R. Maxfield III.

**11.** Since this appeal was filed, the Frakers have entirely satisfied the judgments entered against them. The Bank assigned all of its rights under the judgment to the Frakers. In effect, then, the Bank has ceased to be a party to the appeal, and the Frakers now occupy the Bank's former position as appellees with respect to the indebtedness issues. In the interest of clarity, we will continue to refer to the appellees in this matter as "the Bank".

The district court made no findings of fact concerning these claims. We vacate the judgments on the debts and remand for reconsideration of the amounts in light of the proof concerning Maxfield's asserted setoffs.

 B. *Order of Application.* The Bank, asserting its rights under three security agreements, foreclosed on the assets of Bob Maxfield, Inc. The Bank's calculations, accepted by the district court, apply the proceeds of the foreclosure first to attorney's fees, then to the unguaranteed overdraft note, and finally to the debts guaranteed by the Maxfields and the Frakers. The Maxfields contend that this order of application is inequitable. But the guaranty agreements expressly provide that the Bank is empowered to apply any funds from Bob Maxfield, Inc. first to unguaranteed debt. The guarantors, therefore, have contractually waived any equitable right they might otherwise have had to control the order of application.

C. *Attorneys' fees.* All of Bob Maxfield, Inc.'s notes provide for an attorney's fee of ten percent of the amount due at the time that the notes are put into the hands of an attorney for collection. The Maxfields and Bob Maxfield, Inc. contend that fees should be awarded on only the deficiency remaining after the foreclosure sale (plus subsequent interest), and not on the entire original amount due when the debtor defaulted. We disagree. Under Texas law, when an attorney acts as trustee to foreclose on a deed of trust but performs no services in his professional capacity, he may not collect the contractual attorney's fee. *Hodges v. Star Lumber & Hardware Co.*, Tex.Civ.App.1976, 544 S.W.2d 185; *American National Insurance Co. v. Schenck*, Tex.Civ.App.1935, 85 S.W.2d 833. Here, however, the Bank's attorney took numerous legal steps in preparation to foreclose on the Maxfield assets. It does not matter whether his professional services were directed toward a foreclosure or some other avenue of collection; in either case the notes were put into the hands of an attorney for collection.

The Maxfields contend that they are not personally liable as guarantors for attorney's fees. This is contradicted by the text of their guaranty agreements, under which they guarantee "all indebtedness ... not exceeding the aggregate principal plus interest [on the notes], ... *together with and plus all ... costs of collection* owing and which may become owing thereon or in connection therewith". Record at 120, 130 (emphasis added).

The district court's judgment is AFFIRMED as to the antitrust and Automobile Dealers Act complaints. The judgment as to indebtedness is VACATED and REMANDED for reconsideration of the amount in accordance with this opinion.