**LOGIC PROCESS CORPORATION,**
Plaintiff,

v.

**BELL & HOWELL PUBLICATIONS SYSTEMS COMPANY,**
Defendant.

No. Civ.A. 3:96CV2414L.

United States District Court,
N.D. Texas,
Dallas Division.

April 4, 2001.

Bruce E. Longenecker, Law Office of Bruce E. Longenecker, Dallas, TX, for Plaintiff.

Jane Makela, Tod Bruce Edel, Michael A. Birrer, Carrington, Coleman, Sloman & Blumenthal, Dallas, TX, Deborah A. Coleman, Sherrese M. Smith, Hahn, Loeser & Parks, Cleveland, OH, for Defendants.

John L. Estes, Locke, Liddell & Sapp, Dallas, TX, pro se.

### *MEMORANDUM OPINION AND ORDER*

LINDSAY, District Judge.

Before the court is Defendant's Renewed Motion for Judgment as a Matter of Law, filed December 8, 1999. The court, after considering the motion, response, briefs of the parties, and the record, **grants** Defendant's motion for the reasons stated herein.

### I. *Procedural and Factual Background* [1]

The trial of this action commenced on November 1, 1999, and ended after sixteen days of trial on November 23, 1999. The jury, although given an *Allen* charge, informed the court that it still could not reach a verdict. After determining that the jury was deadlocked and could not reach a verdict, the court declared a mistrial on November 23, 1999.

This action was removed from state court to this court on August 26, 1996. Plaintiff Logic Process Corporation ("Logic Process" or "Plaintiff") sued Defendant Bell & Howell Publications Systems Company ("Bell & Howell" or "Defendant") for allegedly engaging in a "tying" arrangement in violation of federal and Texas antitrust laws [the Sherman Act § 1, Clayton Act § 3 and the Texas Free Enterprise Act § 15.05(c) ], for tortious interference with a contract, and for tortious interference with prospective business relations. Logic Process' principal business is producing and selling computer equipment, equipment upgrades, support services and maintenance contracts relating to such equipment. Bell & Howell develops and sells software which can be used on equipment such as Plaintiff's, and also markets equipment competitive to that of Plaintiff. *See* Pl.'s First Am. Compl. ¶ 2. Logic Process contends that in 1996, Bell & Howell discontinued making and selling powersports price book updates on cassette tape in DB7 data format. Bell & Howell decided to sell price book updates only on CD–ROM, in a UDB data format that was not readable by computers manufactured by Logic Process. Logic Process also contends that this decision by Bell & Howell violated the Texas and federal antitrust laws because dealers who had Logic Process or "Pinnacle" computers could not use the CDs as they were published. If the dealers wanted to use the price book updates that Bell & Howell published on CD, they had to acquire new computers, which Bell & Howell supplied.

---

1. No transcript has been prepared of the trial of this action. The facts set forth in this decision come from the clerk's docket sheet, Plaintiff's First Amended Complaint, the Pre-trial Order, certain trial exhibits and the court's notes and recollection of the trial testimony.

Logic Process also contends that Bell & Howell's decision interfered with Logic Process' monthly maintenance contracts with its mutual customers and intentionally prevented Logic Process from obtaining further business from upgrades and repairs of Logic Process computers, in addition to any additional maintenance agreements.

In response, Bell & Howell contends that its discontinuation of price book updates in DB7 data format and its decision to distribute price book updates on CD in a UDB data format did not violate any law. Bell & Howell contends that it decided to stop making and selling price book updates on tape in DB7 data format in order to improve its efficiency and to provide customers a better product at a lower price. Bell & Howell contends that making and distributing price book updates on tape in DB7 format presented many problems and limitations. Bell & Howell contends that the DB7 database used by Lightspeed software compatible with Logic Process computers was limiting and out of date, and its decision not to produce price book updates compatible with the Logic Process computers was a reasonable business decision in light of the state of technology. Bell & Howell contends that customers who bought new IBM compatible computers had more options for computer repair and maintenance than they had with Logic Process computers. Finally, Bell & Howell contends that in 1996, Logic Process had no reasonable expectation of ongoing future revenues from its dealers using the Lightspeed Dealers Management System, and that Logic Process lost customers because of its own business decisions.

The parties did not agree on much in this case but some of the following facts were stipulated to by the parties. Those facts, which are set forth in the Joint Pretrial Order, filed December 30, 1997, provide necessary background information. The stipulated facts are:

1. Plaintiff Logic Process is a Texas corporation incorporated in 1986.

2. Logic Process' business has included the assembly and sale of computers, computer components and peripherals, and computer repair and maintenance services.

3. The central processing unit ("server" or "computer") that Logic Process sold for use by motorcycle dealers uses a Motorola 680X0 processor.

4. The "Pinnacle" name was and is associated with some computers serviced by Logic Process because Pinnacle Systems, Inc., a sister company of Logic Process, sold computers based on a Motorola 680X0 processor from the mid '80's to mid 1990.

5. Logic Process and Pinnacle Systems, Inc. are both corporations owned by Logic Holdings, Inc., a corporation that is, in turn, owned by David Winstanley.

6. Logic Holdings and its subsidiaries share employees, equipment and the same leased offices in Dallas.

7. Bell & Howell is a Delaware corporation with its principal place of business in Cleveland, Ohio.

8. Bell & Howell is a subsidiary of Bell & Howell Corporation.

9. Bell & Howell develops, publishes and distributes specialized computer software, including manufacturers' parts price data in electronic form.

10. Bell & Howell acquired assets of Lightspeed Dealer Management Systems, Inc. ("Lightspeed") in August, 1994.

11. Lightspeed Dealer Management Systems, Inc. began selling application software for powersports dealerships in the mid–1980's.

12. In the mid–1980's, Lightspeed Dealer Management Systems ("LDMS") software was written to run on a computer running a "P system" operating system.

13. Beginning some time in the mid 1980's, Lightspeed, as a reseller for Pinnacle Systems, Inc., sold computers with Motorola 680X0 processors to motorcycle dealers to run its Lightspeed Dealer Management Systems. From approximately 1990–1991, Lightspeed provided similar equipment to motorcycle dealers, supplied by Logic Process.

14.. Those motorcycle motorsport dealers who, as of January 17, 1996, were using LDMS software for Logic Process on Logic Process computers are sometimes referred to as "mutual customers" of Bell & Howell and Logic Process.

15.. No contract ever existed between Bell & Howell and Logic Process.

Joint Pretrial Order at 7–9; Court's Charge to the Jury at 6–8.

The court ordered the parties to agree on a glossary of terms to facilitate the jury's understanding of technical words and phrases used in the field of high technology. That glossary is set forth in the Court's Charge to the Jury, filed November 23, 1999, and restated herein for convenience of the court and the parties:

1. The Lightspeed Dealer Management Systems is an integrated application sold to motorcycle dealers and other powersports retailers to keep track of their inventory, current parts price information and accounting information, as well as other relevant business information and records.

2. Lightspeed Dealer Management Systems, Inc. (sometimes called "Lightspeed Company") originated the Lighspeed Dealer Management Systems. Its assets were purchased by Bell & Howell in August 1994.

3. Pinnacle Systems, Inc. is a sister corporation of Logic Process. Pinnacle Systems originally sold servers to Lightspeed Dealer Management Systems, Inc. for resale with the Lightspeed Dealer Management Systems software.

4. A price book update is current information about the prices charged to dealers by a given manufacturer of powersports equipment, parts or accessories. Price book updates may be distributed in electronic form, formatted to be compatible with specific dealer management system software. Bell & Howell published price book updates on tape until early 1997, and on CD thereafter.

5. "Mutual customer" is a term Plaintiff used to refer to a dealership that sold motorcycles and accessories and who used the Lightspeed Dealer Management Systems in combination with a Pinnacle or Logic Process server.

6. A "personal computer" or "PC" is a digital information processing device designed for use by one person at a time. A typical PC consists of central processing components (e.g., a microprocessor and main memory) and mass data storage (such as a hard disk).

7. A "server" is a computer designed to provide data, services and functionality through a digital network to multiple users. A PC, with additional components, may be used as a

server in certain applications, such as the Lightspeed Dealer Management Systems.

8. An "operating system" is a software program that controls the allocation and use of computer resources (such as central processing unit time, main memory space, disk space and input/output channels). The operating system also supports the functions of software programs, called "applications," that perform specific user-oriented tasks.

9. A "database" is a file data storage system from which stored information is obtained by command from the application software for use in a particular process.

10. An "application" or "application software" is a software program that performs specific user-oriented tasks.

11. The "P-system" is an operating system implemented by Logic Process Corporation for use with its servers.

12. A "tape" is a medium used in the computer industry for storing and transmitting data.

13. A "CD–ROM drive" refers to a standard peripheral hardware device which can be connected to a server.

14. A "CD" or "compact disk" is a medium used in the computer industry for storing and transmitting data.

15. "Encryption" refers to a security system whereby electronic information, once encrypted, cannot be read by those who do not have the decoding key.

16. UNIX is a collection of operating systems, originally developed by AT & T.

17. SCO–UNIX is a "flavor" of UNIX used as an operating system for servers with Intel Processors.

18. "IBM compatible" is a term sometimes used to refer to computers or servers with Intel processors.

19.. "Peripheral devices" is all equipment attached to a server such as terminals (screens), printers, CD–ROM drives, tape drives. Peripheral devices are considered separate from a server's internal components.

20. A "modem" is an electronic device by which electronic data or code may be transferred to and from one computer system to another over a telephone connection.

21. "Hardware" includes a server, its chassis, power supply and internal components, such as processors (chips), boards, disc drives, memory (RAM), and may also refer to peripheral devices attached to a server.

22.. "Software" is a computer program written in code. Applications and operating systems are both software.

23.. "Algorithm" is an equation or formula for re-arranging, compacting and/or encrypting electronic data.

24.. The term "format" is used in a variety of ways in the computer industry. In this case, the term has been used to refer (1) to the way in which a storage medium, such as a tape or CD, is prepared to accept data and (2) to the organization of the data that is stored on a tape or CD.

Court's Charge at 9–11.

## II. *Standard of Review*

Judgment as a matter of law is proper where "there is no legally sufficient evi-

dentiary basis for a reasonable jury to find for [a] party." Fed.R.Civ.P. 50(a)(1). The court must "view the entire trial record in the light most favorable to the nonmovant, drawing reasonable inferences in its favor." *Burch v. Coca–Cola Co.*, 119 F.3d 305, 313 (5th Cir.1997). A court must test the sufficiency of the evidence under the standard enunciated in *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir.1969) (*en banc*), *overruled on unrelated grounds, Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 336–38 (5th Cir.1997) (*en banc*). *Casarez v. Burlington Northern Santa Fe Co.*, 193 F.3d 334, 336 (5th Cir.1999). Under *Boeing*, "[t]here must be a conflict in substantial evidence to create a jury question." 411 F.2d at 375. Substantial evidence is "evidence of such quality and weight that reasonable and fairminded [persons] in the exercise of impartial judgment might reach different conclusions." *Id.* at 374; *see also Krystek v. University of Southern Miss.*, 164 F.3d 251, 255 (5th Cir.1999).[2]

## III. *Analysis*

### A. Plaintiff's Antitrust Tying Claim

Logic Process contends that Bell & Howell violated the antitrust laws of the United States and Texas by using a "tying" arrangement in its business with mutual customers. "Mutual customers" is a term used by Plaintiff to refer to a dealership that sold motorcycles and accessories that used the Lightspeed Dealer Management Systems in combination with a Pinnacle or Logic Process server. A "tying" arrangement is one in which a seller of a product or service refuses to sell a product desired by a buyer unless the buyer also agrees to purchase a second product which is not desired. *Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451, 461, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 89 F.3d 233, 236 n. 2 (5th Cir.1996), *cert. denied*, 519 U.S. 1116, 117 S.Ct. 960 (1997). The desired product is the "tying product," and the second product is the "tied product." *Id.* Plaintiff contends that the "tying product" (the desired product) is the Lightspeed software with current price book data and that the "tied products" are the servers (the undesired product). Plaintiff Logic Process must establish each of the following five elements for an illegal "tying" arrangement to exist: (1) there were two separate and distinct products, as opposed to components of a single product; (2) the two products were tied together, or customers were coerced into buying the tied product; (3) the seller possessed substantial economic power over the tying product; (4) the tie restrained free competition in the market for the tied product; and (5) the tie affected more than an insubstantial volume of commerce. *See United Farmers Agents*, 89 F.3d at 236 n. 2; *Bob Maxfield, Inc. v. American Motors Corp.*, 637 F.2d 1033, 1037 (5th Cir.), *cert. denied*, 454 U.S. 860, 102 S.Ct. 315 (1981). The court believes that the second element is dispositive of the tying claim, and therefore finds it unnecessary to discuss the other four elements of this claim.

■ With respect to the second element, a seller may use strong persuasion, encouragement or cajolery to the point of being obnoxious to induce the purchase of an allegedly tied product. Actual coercion must be established to support a tie-in claim, and an antitrust violation occurs

---

**2.** Plaintiff Logic Process contends that reasonable persons in fact disagreed because the jury could not reach a verdict. That the jury could not reach a verdict is not determinative of the court's analysis. The ultimate question that the court must decide is whether a legally sufficient evidentiary basis exists to find for Logic Process.

only if the seller goes beyond persuasion and actually coerces or forces the customer to buy the tied product in order to obtain the tying product. *See Bob Maxfield, Inc.*, 637 F.2d at 1037. Refusal to sell, standing alone, is not coercion. A business has the right to make its own decision to choose its customers and refuse to sell goods or services to anyone, provided such refusal is not based on illegal conduct. A business also has a right to make its own decision to add products or services or discontinue products or services.

■ Plaintiff Logic Process contends that ample evidence shows that Bell & Howell conditioned customers' continued effective use of its (Bell & Howell) software on the purchase of server hardware from Bell & Howell. The price book data information that Bell & Howell sold was only on CD–ROM in a data format not readable by computers manufactured or used by Logic Process. The data was encrypted and could not be read without a decoding key. Bell & Howell did not provide a decoding key to Plaintiff or its customers. According to Plaintiff, refusal to provide a decoding key prohibited the continued use of its equipment by Plaintiff's customers.

The record does not contain legally sufficient evidence to support a tie-in between the Lightspeed data with current price book data and servers from Bell & Howell. The evidence before the court in this regard consisted of the testimony of several witnesses and Bell & Howell's policy regarding the use of equipment which was not that of Bell & Howell. The testimony of the witnesses was that representatives of Bell & Howell told several customers that Bell & Howell could not guarantee that customers' dealer management systems would function if they did not use Bell & Howell's hardware. With respect

to Bell & Howell's policy on purchasing equipment, the policy did not prevent a customer from purchasing hardware from a source other than Bell & Howell. The policy states that Bell & Howell assumed no responsibility for any damage or malfunction of equipment caused by or to equipment which is not that of Bell & Howell. The underlying and persistent theme of Logic Process is in essence that Bell & Howell was under some legal obligation to ensure, maximize or subsidize its (Logic Process's) profitability or viability. The court is aware of no law which makes it incumbent upon a business entity to accommodate the needs of a competitor. As a business entity, Bell & Howell has a right to make changes in the manner it delivers its services or products for better or worse. That the business decisions may not have improved the quality or efficiency of Bell & Howell's products or services to mutual customers is of no consequence.

Business entities frequently make business decisions which anticipate an improvement in the quality of services and products, but the improvement is not realized or falls significantly below expectations. Whether the changes made by Bell & Howell had the effect intended and increased profits for Bell & Howell is of no moment. Nothing required Plaintiff's customers to purchase servers or other equipment from Bell & Howell. Of course, this certainly was an option. There were other sources available to the customers. While it is true that going to a source other than Bell & Howell or acquiring a new system could well have been more expensive to the customers, such increase in expenditures alone does not constitute a tie-in or coercion.

With respect to the refusal of Bell & Howell to provide a decoding key, the court is aware of no legal requirement that

would compel Bell & Howell to provide a decoding key to Logic Process or to its customers. Therefore, any contention based on this refusal fails as a matter of law to establish a tie-in or coercion.

For the reasons stated previously, the court believes that insufficient evidence exists to support a tie-in or coercion. The failure to establish this element necessarily defeats Logic Process' antitrust claim, and Bell & Howell is entitled to judgment as a matter of law on the antitrust claim.

**B. Plaintiff's Claim for Tortious Interference Claim with a Contract**

■ Logic Process contends that Bell & Howell tortiously interfered with its maintenance contracts with mutual customers of Bell & Howell and Logic Process. In order for Logic Process to establish a claim for tortious interference with an existing contract, it must demonstrate: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) such act was a proximate cause of damages to Plaintiff; and (4) actual damage or loss occurred. *Thrift v. Hubbard,* 44 F.3d 348, 356 (5th Cir.1995); *Holloway v. Skinner,* 898 S.W.2d 793, 795–96 (Tex.1995).

■ Legal justification is an affirmative defense to a claim of tortious interference to an existing contract. *Texas Beef Cattle Co. v. Green,* 921 S.W.2d 203, 210 (Tex.1996). A justification defense is premised on "the exercise of (1) one's own legal rights or (2) a good faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken." *Id.* at 211. The court finds that Bell & Howell had a legal right to make a business decision to discontinue the price book updates on cassette tapes and to distribute

and sell them only on CD–ROM in a data format not readable by computers manufactured by Logic Process. The court further finds that no agreement existed between Logic Process and Bell & Howell which required Bell & Howell to provide a decoding key, and that no law required Bell & Howell to provide a decoding key to Plaintiff or Plaintiff's customers. As stated before, whether the efficiency and improvement in service were realized is really immaterial. The question is whether Bell & Howell acted in the exercise of its rights, and the court finds that it did. The injury, if any, to Logic Process is incidental to Bell & Howell's exercise of its legal rights and therefore no cause of action arises against Bell & Howell. *Id.* For these reasons, there is no legally sufficient evidentiary basis to find for Logic Process on this claim. Accordingly, Bell & Howell is entitled to judgment as a matter of law on this claim.

**C. Plaintiff's Claim of Tortious Interference with Business Relationships**

■ To establish a claim for tortious interference with business relationships, Plaintiff Logic Process must show that: (1) there was a reasonable probability that it and a customer would have entered into a contractual relationship; (2) Bell & Howell committed a malicious and intentional act that prevented the relationship from occurring, with the purpose of harming Logic Process; (3) Bell & Howell lacked privilege or justification to do the act; and (4) actual harm or damage resulted from Bell & Howell's interference. *See Thrift,* 44 F.3d at 356–57 (*citing Exxon Corp. v. Allsup,* 808 S.W.2d 648, 659 (Tex.App.-Corpus Christi 1991, writ denied)).[3] An act is

---

**3.** Although *Thrift* refers to the claim as a cause of action for tortious interference with

prospective contractual relations, this claim appears to be identical to, or at least the

considered to be malicious if it is done without just cause or excuse. *Allsup,* 808 S.W.2d at 659. In its analysis of Plaintiff's claim for tortious interference with a contract, the court found that Bell & Howell had a legal right to do the acts of which Plaintiff complains. The claim for tortious interference with a contract and that of tortious interference with a prospective business relationship are based on the same acts of Bell & Howell. The court's analysis of the tortious interference with an existing contract controls the outcome of this claim because Bell & Howell had legal justification to do the acts made the basis of this claim. The court adopts its earlier analysis and thus sees no benefit to restating that analysis here. Insufficient evidence exists to establish that Bell & Howell lacked justification. Since Logic Process failed to establish this necessary element, Bell & Howell is entitled to judgment as a matter of law on this claim.

### IV. *Miscellaneous Matters*

Bell & Howell filed other motions for judgment as a matter of law on November 10 and 17, 1999. Those motions are **denied as moot.** Bell & Howell's Motion for Leave to File Motion in Limine, filed September 22, 1999, is also **denied as moot.** The court only addressed matters or issues it deemed necessary to rule on the instant motion for judgment as a matter of law. Accordingly, if an issue was not addressed, the court did not consider the issue material to its ruling.

### V. *Conclusion*

For the reasons stated herein, there is no legally sufficient basis for a jury to find for Plaintiff on any of its three claims. Accordingly, Defendant's Renewed Motion for Judgment as a Matter of Law is grant-

ed. Plaintiff's claims are dismissed with prejudice against Defendant Bell & Howell. Judgment will be issued by separate document as required under Fed.R.Civ.P. 58.

---

functional equivalent of, a cause of action for tortious interference with a business relationship. *Thrift,* 44 F.3d at 357 n. 16 (citations omitted).