**EXXON CORPORATION, Appellant,**

**v.**

**Robert W. ALLSUP, Sr., Appellee.**

**No. 13–90–127–CV.**

Court of Appeals of Texas, Corpus Christi.

April 18, 1991.

Rehearing Overruled May 16, 1991.

Rene J. Mouledoux, Susan B. Sanchez, Tamara C. Sampson, Houston, for appellant.

W.R. Hitchens, Kingsville, for appellee.

Before NYE, C.J., and SEERDEN and HINOJOSA, JJ.

## OPINION

NYE, Chief Justice.

This is a suit for tortious interference with a contractual or business relationship

and for tortious interference with a prospective employment relationship. The jury found that appellant, Exxon Corporation (Exxon) interfered with a contractual or business relationship between appellee Robert Allsup and King Ranch, Incorporated (King Ranch), and that Exxon negligently and with malice "handled" Allsup's employment relationship. The jury awarded Allsup $315,687.82 in actual and punitive damages. Exxon asserts twenty-nine points of error. As modified, we affirm the trial court's judgment.

In May, 1961, King Ranch secretary Cy Yeary hired Allsup to guard a specific gate on the ranch's Laureles division. The assigned gate, later named the Allsup Gate, allowed access to Exxon operations on the Alazan oilfield. It experienced considerable daily traffic. Yeary and Allsup agreed that Allsup would hold the gate guard position for life, that King Ranch would provide him with a house at his assigned post, pay his utilities and a minimum hourly wage and that, should he retire, he could live on the ranch until he died.

In June, 1976, King Ranch sent a letter to Allsup which informed him of a reorganization of the gate guards due to Exxon's relocation of operations on the ranch. The letter also stated, in pertinent part:

It has also become desirable to centralize management of the gates and to define responsibility. General management of the gates will be placed in the hands of Walter Hock. We have made considerable effort to preserve employment of those who are presently employed as gate persons. It is our understanding that Mr. Hock will make available to you an employment application. It is our belief that the change in management will permit more desirable schedules and will be beneficial to all persons.

Accordingly, Exxon sub-contracted gate guard management to Walter Hock d/b/a Walter's Oilfield Services (WOS), an independent contractor. As a contract condition, both King Ranch and Exxon management personnel specifically ordered Hock to hire Allsup as a WOS gate guard. For the next twelve years, Allsup took his immediate orders from either Hock or Jim Scott, the WOS supervisor, and was paid by WOS to guard the Allsup gate. He continued to live in a King Ranch house stationed at the gate with utilities paid by the ranch.

In late 1988, Exxon awarded the 1989 gate guard contract to Don Brock, Distributor (DBD), which out-bid WOS for the job. On December 28, 1988, as Allsup collected his paycheck, he received the news that DBD held the 1989 gate guard contract and that DBD would not hire him as a gate guard.

Allsup then filed an age discrimination complaint against DBD with the Texas Commission on Human Rights (TCHR) and the Equal Employment Opportunity Commission (EEOC). The complaint stated that Allsup was denied employment to the gate guard position on or about January 1, 1989, that Don Brock informed Allsup that DBD could not hire him because Exxon field superintendent Butch Hamilton did not want Allsup working there anymore, and that Allsup believed he had been denied employment at DBD because he was 73 years old.

DBD's president, Don Brock, responded to the TCHR–EEOC complaint with a letter denying the age discrimination charge and stating, in pertinent part:

Mr. Allsup has a problem with Exxon Company, U.S.A. that began before my company took over the gate guards.

On or about December 30, 1988 I went to Mr. Allsup and discussed my position with him. I explained to him that I could not hire him unless the problem was resolved. The problem has not been resolved as of today.

DBD did not hire Allsup, who responded by filing suit against Exxon and Hamilton alleging that they tortiously interfered with Allsup's lifetime employment contract, tortiously interfered with Allsup's prospective employment relationship and that their acts and conduct were negligent, reckless and intentional acts which proximately resulted in the infliction of emotional distress on Allsup. The claims against Butch Ham-

ilton were dropped before trial, leaving Exxon as the sole defendant.

At trial, Allsup testified that in 1961 King Ranch hired him to guard for life the Allsup gate. He understood that in July, 1976, King Ranch effectively relinquished the management of all gate guards to Exxon, which in turn sub-contracted the service to WOS. Thereafter, WOS supervised Allsup's job performance.

Allsup stated that when he received his last WOS paycheck in December, 1988, he learned that WOS no longer held the gate guard contract. He contacted DBD for more information. Don Brock informed Allsup that he was not on the rehire list. Allsup testified that Brock explained that he would not hire Allsup because to hold the gate guard contract, DBD must do whatever Exxon told DBD to do. However, if Allsup could "go out and get straightened out with Exxon's Butch Hamilton, I'll [DBD] put you [Allsup] to work." Later, Walter Hock informed Allsup that Exxon told DBD not to hire Allsup.

Allsup testified that he had no previous problems with Hamilton and that Hamilton never complained to him about the quality of his work. Allsup believed that he was on good terms with Hamilton's supervisor, James Richey. He stated that Richey never complained to him about his work as a gate guard. When he went to talk to Hamilton about the alleged "problem" between them, Hamilton refused to speak, other than to tell him to contact the person identified on a slip of paper which he handed to Allsup. The paper identified the name and telephone number of Exxon's legal counsel.

Allsup stated that in 1987, he experienced a spinal tumor. The tumor interfered with his ability to perform certain functions associated with his job, such as repeatedly stooping to fasten and unfasten a barrier rope at the entrance. The barrier was intended to stop all traffic, entering or leaving the premises, for identification. All gate guards were required to keep the barrier rope raised at all times when not allowing passage.[1] Because of his condition, Allsup obtained a dispensation from King Ranch allowing him to leave the rope down. This dispensation superseded the same requirement in Exxon and WOS gate guard rules.

Allsup also discussed the so-called "air conditioner" incident. During the 1986–88 period, Exxon and King Ranch designed and constructed several new gate houses, including one at the Allsup gate. During construction, a King Ranch supervisor offered Allsup a window unit for the new gate house. Allsup asked Richey for permission to install the unit. Richey eventually refused Allsup's request, stating that Matthew Soulant, Richey's supervisor, did not want air conditioners in the gate houses. Allsup testified that he was "a little upset" over the refusal and on one occasion indicated that disappointment to Hamilton. At trial, Exxon employees Richey and Hamilton both testified that Allsup used some profanity to express his disappointment that Soulant denied his request. At the time of trial, Allsup continued to live in the Allsup gate King Ranch-provided house, with utilities paid by the ranch, and received a small stipend from the ranch. He testified that he would have continued to perform his gate guard duties had Exxon not interfered.

Walter Hock testified that he owned WOS and that in 1976, when WOS took responsibility for providing gate guards for the King Ranch, both Ranch and Exxon management personnel told him that Allsup held a lifetime job as a King Ranch gate guard. Hock stated that Allsup did "what he was supposed to do" in his work for WOS, Exxon and King Ranch and that Allsup "never gave WOS any trouble." He recalled that during the last week of December, 1988, King Ranch indicated approval and satisfaction with Allsup's performance to WOS.

---

1. Exxon, King Ranch and WOS each issued stringent regulations to the gate guards regarding various topics such as the procedures required to record incoming or outgoing ranch traffic, what items (i.e. cameras, pets, firearms) were prohibited on ranch property, and setting the gate guard dress code.

Hock noted Exxon began to complain about Allsup's job performance the last few years that WOS held the gate guard contract. Specifically, he noted that Exxon wanted Allsup to "stand up" at the gate, but King Ranch ordered that Allsup did not have to do that. Hock stated that WOS did not receive any complaints about Allsup's alleged "cussing," and recalled that "everyone," including Exxon employees, "talked rough" and that there was no difference between the way that Allsup talked and the way that Exxon, as well as other, oilfield workers talked.

Don Brock, owner of DBD, testified that the business earned between $500,000.00 and $550,000.00 from the Exxon gate guard contract. Brock stated that he met with James Richey before DBD's performance began to discuss the gate guard service. At that meeting, Richey indicated that he had several complaints about several WOS gate guards, including Allsup. Brock testified that Richey did not specifically state that he did not want those guards to continue working, but Richey emphasized that "he had problems with them [certain specific gate guards] in the past."

Brock investigated these alleged "problems" and learned from WOS's Jim Scott that King Ranch wanted Allsup to retain his post regardless of the gate guard contractor. He then asked Matthew Soulant whether Exxon required DBD to hire any WOS gate guards. Soulant replied that Exxon had no requirements. After Allsup filed the age-discrimination claim, Soulant suggested to Brock that hiring Allsup "would take the heat off." Brock decided not to hire Allsup because he "could not afford to have problems created" by hiring an employee which Exxon disliked while DBD "was trying to gain Exxon's confidence."

James Richey, Exxon's technical foreman for its South Texas production division, testified for Allsup as an adverse witness. Richey's employment required that he discuss all Exxon complaints regarding gate guard performance with the supervisor employed by the gate guard contractor rather than discuss those problems with an individual guard. In Allsup's case, Richey discussed such problems as the barrier rope requirement with WOS supervisor, Jim Scott. Richey denied that he ever told Don Brock or anyone else not to hire Allsup as a gate guard.

Richey stated that Allsup asked him for permission to install the air conditioning window unit in the new guard house. Richey replied that he would have to inquire whether Exxon and King Ranch would permit the installation. When Richey asked his supervisor, Matthew Soulant, for authorization, Soulant replied that he would prefer not to have air conditioning in the guard house because none of the other houses had air conditioning; however, because of Allsup's long tenure at the ranch and because he "had done a bunch of favors" for many King Ranch personnel, Soulant indicated that he would authorize the rewiring of the guard house to accommodate the window unit, should King Ranch also approve. Richey testified that when he sought approval from the King Ranch, the ranch's "Exxon contact," George Williams, denied approval. Later, when Richey informed Allsup that Soulant had denied his request, Allsup became upset.

Richard Thompson, former King Ranch security director for the Laureles division, testified that he did not have any complaints regarding Allsup's work performance. He also stated that, to his knowledge, Allsup never did anything considered a breach of security or that would jeopardize the ranch in any way. Thompson knew that Allsup had King Ranch permission to keep the barrier rope unfastened rather than lower it for each vehicle arriving at the gate.

Butch Hamilton, Exxon field superintendent for the Alazan field, testified that he reported any complaints about the gate guards in his area to James Richey, and that Richey took the appropriate steps to resolve those problems with the gate guard contractor. Hamilton stated that Allsup "got upset and got to cussing" about Matthew Soulant's decision not to allow the window unit installation. He did not know

why DBD would instruct Allsup to "straighten things out" with him before DBD would hire Allsup as a gate guard.

After DBD installed a new guard at the Allsup gate, Allsup sought an interview with Hamilton, who then avoided Allsup. He denied that he ever spoke to Don Brock about not hiring Allsup.

Matthew Soulant testified that James Richey reported to him that Allsup became angry and "cussed me personally" when Allsup learned Soulant's decision to disallow installation of the air conditioning unit in the Allsup gate house. Soulant stated that he met with Don Brock, who asked him whether Exxon or King Ranch had an obligation to ensure Allsup's continued employment as a gate guard. He replied that Exxon had no obligation to Allsup. Soulant also told Brock that King Ranch's Stephen Kleberg believed that the ranch had no obligation to ensure Allsup's continued employment.

On rebuttal, Walter Hock testified that upon receiving the King Ranch gate guard contract, he met with Carl Peters and Mr. Satterwhite, then Exxon's area superintendent and chief clerk, and several King Ranch representatives, including a member of the Kleberg family, Cy Yeary and a Mr. McDougald, a ranch game warden. These people informed Hock that Allsup's work was satisfactory, that he had a job with the ranch for as long as Allsup desired that job and specifically instructed Hock to "take care of him [Allsup] accordingly."

The trial court submitted eleven special issues in the jury charge. The jury answered these issues in favor of Allsup.

Exxon asserts in point of error number three that the trial court erred by submitting Special Issue Number 1 because the issue fails to specify that an affirmative answer must be supported by proof that in December, 1988, a contract existed between Allsup and King Ranch. Exxon asserts in its first and second points of error that the evidence was legally and factually insufficient to support the jury finding that a contractual or business relationship existed between Allsup and King Ranch.

In considering a "no evidence," "insufficient evidence," or an "against the great weight and preponderance of the evidence" point of error, we will follow the well-established tests set forth in *Pool v. Ford Motor, Co.*, 715 S.W.2d 629 (Tex.1986); *Dyson v. Olin Corp.*, 692 S.W.2d 456 (Tex.1985); *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400 (Tex.1981); *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965); *Allied Fin. Co. v. Garza*, 626 S.W.2d 120 (Tex.App.—Corpus Christi 1981, writ ref'd n.r.e.); and Calvert, *No Evidence and Insufficient Evidence Points of Error*, 38 Tex.L.Rev. 361 (1960).

■ The elements of a cause of action for tortious interference with contractual relations are: (a) there was a contract subject to interference; (b) the act of interference was wilful and intentional; (c) such intentional act was a proximate cause of the plaintiff's damage; and (d) actual damage or loss occurred. *Juliette Fowler Homes, Inc. v. Welch Assocs.*, 793 S.W.2d 660, 664 (Tex.1990); *B. Cantrell Oil Co. v. Hino Gas Sales, Inc.*, 756 S.W.2d 781, 784 (Tex.App.—Corpus Christi 1988, no writ); *Diesel Injection Sales & Serv., Inc. v. Renfro*, 656 S.W.2d 568, 573 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.).

Exxon argues that Allsup failed to establish that in 1988 a contract existed between Allsup and King Ranch with which Exxon interfered. Specifically, Exxon asserts that Allsup's "lifetime contract" was terminated in 1976 by the King Ranch in its letter to Allsup.

■ A cause of action for interference with contractual relations requires evidence of the existence of a contract that is subject to the alleged interference. *Guynn v. Corpus Christi Bank & Trust*, 589 S.W.2d 764, 770 (Tex.Civ.App.—Corpus Christi 1979, writ dism'd). A contract may be the subject of an interference action even though it is unenforceable between the contracting parties. Unless the contract is illegal or otherwise against public policy, the defendant may not raise unenforceabili-

ty of the contract as a defense.[2] *Clements v. Withers*, 437 S.W.2d 818, 821 (Tex.1969); *Armendariz v. Mora*, 553 S.W.2d 400, 404 (Tex.Civ.App.—El Paso 1977, writ ref'd n.r. e.).

The record shows that in return for living at the gate site and guarding access to ranch property, King Ranch provided Allsup with a house at the gate and paid his utility bills and a salary. Although King Ranch relinquished gate guard management to WOS, it continued to control performance of the guard service by issuing a list of rules for gate guards to follow. Both the ranch and Exxon specifically instructed Walter Hock to hire Allsup as a gate guard, explaining that this instruction was to honor a separate contract between Allsup and the ranch. After 1976, Allsup continued to live in the King Ranch house with paid utilities at the Allsup gate, but, per King Ranch directive, received a paycheck from WOS for services rendered. In 1988, Jim Scott informed Don Brock that Allsup had a lifetime contract with the ranch. Brock relayed this information to Soulant, who denied that the contract existed. In 1989, after DBD provided another person to guard the Allsup gate, Allsup continued living in the same ranch house with the same benefits, although King Ranch now paid Allsup a small pension.

The record establishes that in 1976, King Ranch indicated to Exxon, WOS and Allsup that it intended to honor a contractual agreement with Allsup that he remain a King Ranch gate guard. This recognition that a separate contract existed occurred *after* the ranch sent Allsup the notice that gate guards would be managed by WOS. Both Allsup and Hock testified that the contract terms were that Allsup could work as a King Ranch guard for life. All of this was ample evidence for the jury to find that, in 1988, a contract existed between Allsup and King Ranch and that Exxon and its employees knew of the contract. Points one, two and three are overruled.

Exxon asserts in point of error number four that the trial court erred when it submitted Special Issue Number 1 to the jury because the issue erroneously states that tortious interference with an existing contract requires the existence of a contract *or* a business relationship. A party objecting to an issue included in a charge must point out distinctly the objectionable matter and the specific grounds of the objection or such objection is waived. *Allen v. American Nat'l Ins. Co.*, 380 S.W.2d 604, 608–609 (Tex.1964); Tex.R. Civ.P. 274; Tex.R.App.P. 52(a). An objection at trial which is not the same as the objection urged on appeal presents nothing for appellate review. *City of Brady v. Bennie*, 735 S.W.2d 275, 285 (Tex.App.— Eastland 1987, no writ).

At trial, Exxon specifically objected to Issue Number 1 asserting that issue was not supported by Allsup's pleadings and stating that the pleadings referred to an "interference with an employment agreement or employment relationship" rather than a "contractual or business relationship." Exxon insisted that the proposed issue presented a much broader concept than alleged in the pleadings and was confusing. Exxon failed to discuss or cite any cases in support of this point of error. Because the objection at trial and the objection raised on appeal are not the same, Exxon failed to preserve error. The point of error is overruled.

Exxon asserts in its fifth and sixth points of error that the evidence was legally and factually insufficient to support the jury's answer to Special Issue Number 2. Exxon's seventh and eighth points of error assert that the evidence was legally and factually insufficient to support the jury's answer to Special Issue Number 3. Point of error number nine asserts that the trial court erred when it overruled Exxon's objection to Allsup's hearsay testimony because that testimony was not admissible under any hearsay exception. In Special

---

**2.** We note that normally, if the term of contracted employment is intended to exceed one year, the employment contract must be in writing to conform to the requirements of the statute of frauds. *Winograd v. Willis*, 789 S.W.2d 307, 311 (Tex.App.—Houston [14th Dist.] 1990, writ denied); Tex.Bus. & Comm.Code Ann. § 26.01(b)(6) (Vernon 1987).

Issue Number 2, the jury found that Exxon interfered with the contractual or business relationship between Allsup and King Ranch. The jury found in Special Issue Number 3 that Exxon's interference was willful and intentional.

Specifically, Exxon asserts that there is no evidence that, during 1988, any person in Exxon management knew that an oral contract for lifetime employment existed between Allsup and the King Ranch. Exxon points to the fact that, in 1988, Matthew Soulant was told by Stephen Kleberg that King Ranch did not have a lifetime contract for Allsup's services. Therefore, Exxon asserts that it did not have the requisite intent to interfere with the contract. Because the evidence proves otherwise, we disagree.

■ To establish the requisite element of intent, the plaintiff must show either that the interfering party had actual knowledge of the existence of the contract and of the plaintiff's interest in it or that the interfering party had knowledge of such facts and circumstances that would lead a reasonable person to believe in the existence of the contract and the plaintiff's interest in it. *Armendariz*, 553 S.W.2d at 406; *Tippett v. Hart*, 497 S.W.2d 606, 611 (Tex.Civ.App.— Amarillo) *writ ref'd n.r.e.*, 501 S.W.2d 874 (Tex.1973) (per curiam).

■ The evidence shows that in 1976, both Exxon and King Ranch officials demanded that WOS give Allsup a job because Allsup had a prior, overriding contract with King Ranch. Walter Hock testified that this hiring requirement was a condition of Exxon's awarding the gate guard contract to WOS. This requirement is sufficient to establish that Exxon had actual knowledge of the lifetime contract. Furthermore, in 1988, Jim Scott told Don Brock, who then told Soulant that a lifetime contract existed. Allsup lived in a King Ranch-provided house at the Allsup gate. He was past the usual retirement age and received deferential treatment from King Ranch personnel regarding his compliance with the rules requirements.

Although Exxon argues that Soulant had no personal knowledge of the contract,

there is no evidence that he investigated within Exxon to verify his assertion that the contract did or did not exist. Nevertheless, in 1976, Exxon itself knew of and honored the contract when it agreed with King Ranch that Allsup should work with WOS. There is sufficient evidence from which the jury could properly infer that in 1988 Exxon and its personnel knew the contract existed and of Allsup's interest in that contract.

On direct examination, Allsup testified that he learned from Walter Hock that DBD would not hire him as a gate guard because Exxon told Don Brock not to hire Allsup. The trial court overruled Exxon's objection that such testimony was hearsay. Later, under questioning by Exxon's attorney, Allsup testified, without objection, that:

> He [Hock] told me, he said, 'Bob,' he said, 'They took the gates away from me and they told Don Brock and give them to Don Brock and told him not to hire you.' That's what he told me. Same exact words.

Furthermore, Allsup's TCHR–EEOC complaint, admitted into evidence without objection, stated that Don Brock told Allsup that he would not hire Allsup because Exxon field superintendent Butch Hamilton did not want Allsup working as a gate guard. Brock's response letter, also admitted into evidence without objection, stated that Brock "went to Mr. Allsup and discussed my position with him." That position was that "I could not hire him [Allsup] unless the problem was resolved." Don Brock also testified that he "had to go by what I'm told ... if you can go out there and get straightened out with Butch Hamilton, I'll put you to work." He referred Allsup to Hamilton because "that was who the problem was with." Brock also stated that he might have discussed the situation between Hamilton and Allsup with James Richey. Exxon did not properly preserve the error it alleges in point of error nine.

Butch Hamilton knew Allsup for the twelve years that he supervised the Alazan field and conferred, through James Richey, with either Walter Hock or Jim Scott from

WOS regarding any dissatisfaction Exxon had with his job performance. Although WOS and Allsup did not know it, Hamilton was dissatisfied with Allsup as a gate guard. This dissatisfaction was communicated from Exxon to DBD when James Richey and Hamilton each discussed DBD's hiring of WOS gate guards with Don Brock. Clearly, Brock's sole reason for not hiring Allsup was that the "unresolved problem" between Hamilton and Allsup would jeopardize DBD's lucrative gate guard contract.

There is sufficient evidence from which the jury could find that in 1988, Exxon knew that Allsup held a lifetime contract and because certain Exxon officials did not want Allsup as a gate guard, they brought about Don Brock's decision not to hire him. Exxon interfered with Allsup's contractual assurance that he would always be a gate guard for King Ranch and did so wilfully and intentionally. Points of error five, six, seven, eight and nine are overruled.

Exxon's tenth point of error asserts that the evidence is legally insufficient to support the jury's answer to Special Issue Number 4. In point of error number eleven, Exxon asserts that as a matter of law it established its affirmative defense of justification or excuse. Exxon's points of error numbers twelve and thirteen assert that the evidence is legally and factually insufficient to support the jury's answer to Special Issue Number 5. The jury found in Issue Number 4 that Exxon's interference with the aforementioned contractual or business relationship was without just cause or excuse and, in Issue Number 5, that such interference was a proximate cause of damage to Allsup.

■ The privilege of legal justification or excuse in the interference of contractual relations is an affirmative defense upon which the defendant has the burden of proof. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989). This justification or excuse protects one who interferes with another's contract (1) if it is done in a bona fide exercise of his own rights, or (2) if he has an equal or superior right in the

subject matter to that of the other party. *Sterner,* 767 S.W.2d at 691.

Exxon asserts that to the extent that it or its employees involved themselves in Don Brock's decision not to hire Allsup, the involvement was limited to the protection of Exxon's interest in enforcing the terms of the gate security contract and the fulfillment of Exxon's obligations to King Ranch to maintain the ranch's security standards. Therefore, Exxon claims that its involvement was lawful conduct.

The record shows that in 1976, Exxon took responsibility for King Ranch gate security. The ranch communicated its approval or disapproval of gate guard performance not only to Exxon but to WOS supervisors as well. To prevent trespassers, King Ranch established stringent security measures and guidelines for gate guards to follow. These rules were essentially adopted verbatim by Exxon and WOS and distributed to their personnel.

King Ranch never voiced a complaint about Allsup's work performance. Walter Brock testified that not long before the 1988 WOS contract expired, King Ranch specifically indicated that Allsup's work was satisfactory and had no complaints about his performance. Exxon complained about Allsup's failure to raise and lower the rope barrier. At trial, Exxon again asserted that Allsup breached the established security rules by failing to maintain the rope barrier as required. King Ranch permitted Allsup a variance so that he did not have to repeatedly raise and lower the rope throughout the day. The ultimate tribunal for Allsup's compliance with security rules was King Ranch management; therefore, Allsup continued to perform his security work with ranch approbation.

■ The evidence above indicates that King Ranch did not find Allsup's inability to raise and lower the rope barrier sufficient to disapprove of Allsup's work performance. In fact, the ranch indicated to Exxon and to WOS that it did approve of Allsup's work. Although Exxon lawfully exercised its rights when it sought to ensure that all gate guards follow the established rules, once King Ranch designated

the variance, Exxon's rights to insist on Allsup's adherence to the original rule ceased. Furthermore, Exxon did not show that Allsup was in violation of any gate guard rule at the time the WOS contract ended to justify Exxon's assertion that it was maintaining King Ranch security standards. Thus, Exxon's assertions that by notifying Don Brock of Allsup's "noncompliance" with the rules that it was protecting its interests in enforcing the security contract and fulfilling its obligations to maintain King Ranch security standards are invalid. The jury properly found that Exxon's interference lacked justification or excuse. Points ten, eleven, twelve and thirteen are overruled.

In points of error fourteen, eighteen and twenty-two Exxon asserts that there were no pleadings and legally insufficient evidence to support the jury's answers to Special Issue Numbers 6, 7 and 8. These issues were whether Exxon negligently handled Allsup's employment relationship, whether such negligence proximately caused Allsup's damages and what sums of money would fairly and reasonably compensate Allsup for past and future damages.

Texas Rule of Civil Procedure 45(b) requires that pleadings

[c]onsist of a statement in plain and concise language of the plaintiff's cause of action or the defendant's grounds of defense. That an allegation be evidentiary or be of legal conclusion shall not be grounds for objection when fair notice to the opponent is given by the allegations as a whole.

Further, Texas Rule of Civil Procedure 47(a) provides that an original pleading which sets forth a claim for relief shall contain a short statement of the cause of action sufficient to give fair notice of the claim involved. In determining whether a cause of action is pleaded, the pleadings of the plaintiff must be clear enough for the court to ascertain with reasonable certainty, upon examining the pleadings, the elements of the plaintiff's cause of action and the relief sought, with sufficient information on which to base a judgment. *Stoner*

*v. Thompson,* 578 S.W.2d 679, 683 (Tex. 1979); *Henderson v. Henderson,* 694 S.W.2d 31, 35–36 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.).

Generally the petition will be construed as favorably as possible to the pleader. The court will look to the pleader's intent and a pleading will be upheld even if some element of a cause of action has not been specifically alleged. *Gulf, C. & S. F. Ry. Co. v. Bliss,* 368 S.W.2d 594, 599 (Tex.1963); *Henderson,* 694 S.W.2d at 36.

Allsup's petition alleged that Exxon induced a breach of his employment agreement, tortiously interfered with his employment relationship and inflicted emotional distress on him. Examination of the jury questions indicates that Special Issue Numbers 1 through 5 deal with Allsup's allegations that Exxon tortiously induced a breach of his lifetime employment agreement with King Ranch. Thus, we must consider whether Special Issue Numbers 6 and 7, as propounded, relate to Allsup's "tortious interference with employment relationship" allegation.

Specifically, Special Issue Number 6 asked:

Was Exxon Corporation negligent in the manner in which it handled, if it did, ROBERT W. ALLSUP, SR.'s employment relationship?

ANSWER: "Yes" or "No"

ANSWER: <u>YES</u>

Special Issue Number 7 asked:

Was such negligence, if any, a proximate cause of damages to ROBERT W. ALLSUP, SR.?

ANSWER: "Yes" or "No"

ANSWER: <u>YES.</u>

Special Issue Number 9 instructed the jury that if it had answered "Yes" to Question Number 5 or 7, it should then answer Question Number 8. The question asked:

What sum of money, if paid now in cash, would fairly and reasonably compensate ROBERT W. ALLSUP, SR. for his injuries, if any, that resulted from the occurrence in question? .... ANSWER in

dollars and cents for damages, if any, that were sustained in the past:

ANSWER: $76,271.20

in reasonable probablity will be sustained in the future:

ANSWER: $135,237.44.

Broadly construed, we believe that the questions advanced in Special Issue Numbers 6 and 7 are a more restrictive version of the original pleading that Exxon tortiously interfered with his employment relationship with DBD. Points of error fourteen, eighteen and twenty-two, to the extent that they deal with the failure to plead a cause of action, are overruled.

Exxon asserts in point of error sixteen that the trial court erred in submitting Special Issue Number 6 to the jury because the issue erroneously states that negligent conduct may be the basis of a tortious interference cause of action. We agree.

■ Texas law protects prospective as well as existing contracts from third party interference. *Sterner,* 767 S.W.2d at 689; *C F & I Steel Corp. v. Pete Sublett & Co.,* 623 S.W.2d 709, 715 (Tex.Civ.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.); *Harshberger v. Reliable–Aire, Inc.,* 619 S.W.2d 478, 481 (Tex.Civ.App.—Corpus Christi 1981, writ dism'd). The elements of tortious interference with prospective contract or business relationships are: (1) a reasonable probability that the parties would have entered into a contractual relationship, (2) an intentional and malicious act by the defendant that prevented the relationship from occurring, with the purpose of harming the plaintiff, (3) the defendant lacked privilege or justification to do the act, and (4) actual harm or damage resulted from the defendant's interference. *See* 2 J. Edgar & J. Sales, *Texas Torts and Remedies* § 46.03[1] (1990).

■ It need not be absolutely certain that the prospective contract would have been made but for the interference; rather, it must reasonably appear so, in view of all the circumstances. *Harshberger,* 619 S.W.2d at 481; *Cooper v. Steen,* 318 S.W.2d 750, 757 (Tex.Civ.App.—Dallas 1958, no writ). Furthermore, malice, in this connection, is not to be understood in its proper sense of ill will against a person, but in its legal sense, as characterizing an unlawful act, done intentionally without just cause or excuse. *State Nat'l Bank v. Farah Mfg. Co.,* 678 S.W.2d 661, 688–689 (Tex.App.—El Paso 1984, writ dism'd by agr.); *Light v. Transport Ins. Co.,* 469 S.W.2d 433, 440 (Tex.Civ.App.—Tyler 1971, writ ref'd n.r.e.).

■ In the present case, Special Issue Number 6 asked the jury whether there was a *negligent* handling of the business relationship. Because tortious interference with prospective contracts or business relationships is an intentional tort, submission of this special issue was improper. This ruling also renders submission of Special Issue Numbers 7 and 9 improper because they relate to the same cause of action. Point of error sixteen is sustained.

In point of error twenty-three, Exxon asserts that the trial court erred in submitting Special Issue Number 8 to the jury because the issue fails to properly allocate damages between Allsup's tortious interference claim and his negligent handling of employment claim.

■ It is the complaining party's responsibility both to object to the charge and to tender written instructions on the proper measure of damages in substantially correct form. *Texas Cookie Co. v. Hendricks & Peralta, Inc.,* 747 S.W.2d 873, 878 (Tex.App.—Corpus Christi 1988, writ denied); Tex.R.Civ.P. 278. The record shows that Exxon did not specifically object that the question did not allocate damages between the two causes of action. Because Exxon did not tender an instruction on segregation of damages and because it also failed to raise this specific objection at trial, error is not preserved. *American Nat'l Ins.,* 380 S.W.2d at 608–609; Tex.R.Civ.P. 274; Tex.R.App.P. 52(a). Point twenty-three is overruled.

Exxon asserts in points of error twenty and twenty-one that the evidence was both legally and factually insufficient to support the jury's award of damages in Special Issue Number 8. The jury considered the

emotional distress and mental anguish, loss of earnings and public humiliation and embarrassment caused by either Exxon's interference with Allsup's contractual or business relationship or its negligent handling of Allsup's employment relationship. It found that Allsup would be fairly and reasonably compensated for his injuries by awarding him actual past damages in the amount of $76,271.20 and $135,237.44 in actual future damages.

■ ■ ■ Compensation for mental anguish and injury to feelings are recoverable as elements of actual damage when the plaintiff establishes an intentional tort. *Harned v. E–Z Fin. Co.*, 151 Tex. 641, 254 S.W.2d 81, 85 (1953); *Teledyne Exploration Co. v. Klotz*, 694 S.W.2d 109, 111 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.). Furthermore, the Restatement (Second) of Torts, § 774A (1977), provides that one who is liable to another for tortious interference with a contract or a prospective contractual relation is liable for:

(a) **the pecuniary loss of the benefit** of the contract of the prospective relation;

(b) **consequential losses** for which the interference is the legal cause; and

(c) **emotional distress** or actual harm to reputation, if they are reasonably to be expected to result from the interference. (emphasis added)

*King v. Acker*, 725 S.W.2d 750, 754 (Tex. App.—Houston [1st Dist.] 1987, no writ). Comment (d) to § 774A states that a claim for interference with contract is one in tort and that damages are not based upon contract rules; therefore, it is not required that the loss incurred be one within the contemplation of the parties to the contract itself at the time the contract was made.

In *Teledyne* this court wrote:

The term "mental anguish" implies a relatively high degree of mental pain and distress. It is more than mere disappointment, anger, resentment or embarrassment, although it may include all of these. It includes a mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, dispair [sic] and/or public humiliation.

*Teledyne*, 694 S.W.2d at 112; citing *Trevino v. Southwestern Bell Tel. Co.*, 582 S.W.2d 582, 584 (Tex.Civ.App.—Corpus Christi 1979, no writ).

At the time he stopped performing his gate guard duties in December, 1988, Allsup was seventy-two years old and worked thirty-six hours a week at the Allsup gate. At trial two years later, the court took judicial notice that a seventy-four year old man had a life expectancy of 11.26 years. For his gate guard work, WOS paid him $3.35 an hour. As a result of his forced retirement, Allsup received a small pension from King Ranch. He testified about termination from the post he had occupied for nearly twenty-eight years in the manner he experienced "knocks you down a little bit."

Allsup stated that he was not ready to retire in December, 1988, that he enjoyed his job and he wanted to work at the Allsup gate for "as long as I could last." He stated that retirement was "an awful thing." Allsup's gate guard duties included such activities as mowing the yard he cultivated around the gate house, working in a small garden, greasing the hinges on the ranch bump-gates, and "watching traffic" in addition to visiting with the persons he registered on and off the ranch. Not working lowered the amount of physical activity he experienced each day and made him "not look forward to tomorrow like I used to." He stated that he felt humiliated and embarrassed after having a lifetime record of good work when suddenly, his services were refused without any definite reasons from Exxon. He tried not to talk to anyone about his termination because he had never been fired before.

The evidence indicates that Allsup felt a sense of shame and loss of self-esteem due to the loss of his job. Being a gate guard constituted a major portion of Allsup's life and was undoubtedly the source of much of his social interaction and physical activity. Allsup lived in the King Ranch area since 1922 and on the ranch since 1961. Having lived in the same community for most of his life, his friends and neighbors also knew his duties were terminated, causing Allsup to feel humiliated. Not working as

a gate guard reduced his income while his age prevented him from obtaining many other types of work. Finally, not ever receiving a sufficient explanation for his forced retirement was a cause of emotional distress and mental anguish.

■ The evidence supports the jury's awards of past and future actual damages for emotional distress and mental anguish, loss of earnings and public humiliation as a result of Exxon's tortious interference with his contractual relations. Points of error twenty and twenty-one are overruled.

Exxon asserts in points of error twenty-six and twenty-seven that the evidence was legally and factually insufficient to support the jury's answer to Special Issue Number 10. In points of error twenty-eight and twenty-nine, Exxon asserts that the evidence is factually and legally insufficient to support the jury's answer to Special Issue Number 11. In Issue Number 10, the jury found that Exxon acted with malice in handling Allsup's employment and in Issue Number 11 awarded Allsup $100,000.00 in exemplary damages.

Specifically, Exxon argues that exemplary damages were improperly awarded because Allsup failed to prove that Exxon's acts were reckless or malicious. The jury instruction preceding Special Issue Number 10 stated:

> If you have answered Question No. 5 "Yes," then answer Question No. 10; otherwise, do not answer Question No. 10.[3]
>
> Did Exxon Corporation act with malice in handling the employment, if it did, of ROBERT W. ALLSUP, SR.?
> ANSWER: "Yes" or "No"
> ANSWER: <u>YES.</u>
>
> In connection with this question you are instructed that "malice" means ill will, spite, evil motive or purposeful injury of another.[4]

■ Exemplary damages are available in an action for tortious interference with contract where the tortfeasor acted with actual malice. *Clements v. Withers*, 437 S.W.2d 818, 822 (Tex.1969); *Corporate Wings, Inc. v. King*, 767 S.W.2d 485, 487 (Tex.App.—Dallas 1989, no writ). Actual malice for tortious interference with contract claims is defined as "ill-will, spite, evil motive, or purposing the injury of another." *Corporate Wings*, 767 S.W.2d at 487. Actual malice need not be proved by direct evidence but may be inferred from other facts proved. *Corporate Wings*, 767 S.W.2d at 487; *Magcobar North American v. Grasso Oilfield Serv., Inc.*, 736 S.W.2d 787, 799 (Tex.App.—Corpus Christi 1987), *writ dism'd by agr.*, 754 S.W.2d 646 (Tex. 1988).

■ The record shows that Exxon management personnel were the only persons dissatisfied with Allsup's work. Walter Hock noted that Hamilton and Richey complained that Allsup was not properly performing his work. However, King Ranch either specifically approved of his work or made specific allowances because of Allsup's disability. Richey and Brock discussed all WOS gate guards and specifically discussed that Exxon "had some problems" with Allsup. Without warning or notice, Allsup discovered that he would no longer guard the Allsup gate when he received his last paycheck from WOS.

Because he "had to do what Exxon told him to do," Don Brock told Allsup to "straighten things out" with Hamilton before he would give him a job with DBD. Hamilton subsequently dodged Allsup to avoid an interview, although before doing so he did not know the nature of Allsup's business. This is sufficient evidence from which a jury could properly infer that Exxon acted with malice when it took steps to

---

**3.** Special Issue Number 5 related to the jury's findings that Exxon interfered with the contractual or business relationship between Allsup and King Ranch.

**4.** We note that the term "handling" is used in this issue and that Exxon does not argue that the question, as worded, relates to the negligent handling of employment claim. However unartfully drafted, this special issue is predicated upon an affirmative finding of tortious interference with the contract or employment relationship between Allsup and King Ranch. Therefore, the issue of malice was properly submitted to the jury.

ensure that Allsup would not continue working as a King Ranch gate guard.

Further, exemplary damages serve to punish the wrongdoer and to provide an example to other wrongdoers. *Corporate Wings,* 767 S.W.2d at 488; *Consolidated Texas Fin. v. Shearer,* 739 S.W.2d 477, 479 (Tex.App.—Fort Worth 1987, writ ref'd). If part of an award lacks sufficient evidentiary support, the proper course is to suggest a remittitur of that part of the verdict. *Larson v. Cactus Utility Co.,* 730 S.W.2d 640, 641 (Tex.1987); *Corporate Wings,* 767 S.W.2d at 484. Because we find that there was sufficient evidence to support a finding that Exxon maliciously interfered with Allsup's contractual or business relationship, the jury could assess the amount of damages for that wrongful conduct. The trial court did not err when it submitted Special Issue Numbers 10 and 11 to the jury. Points of error twenty-six, twenty-seven, twenty-eight and twenty-nine are overruled.

We hold that the evidence supported the findings of tortious interference with a business or contractual relationship between Allsup and Exxon and that such interference was malicious. Because Allsup did not plead a cause of action for negligent handling of employment relationship, the Special Issues relating to that cause of action were not properly before the jury. Furthermore, because Exxon did not properly preserve error regarding the allocation of actual damages between the two causes of action, the jury's actual damages award was proper. Finally, the evidence was sufficient for the jury to properly find that Exxon acted with malice in its interference and to award $100,000.00 in exemplary damages. Discussion of the remaining points of error is unnecessary. Tex.R.App.P. 90(a).

MODIFIED, AND AS MODIFIED, AFFIRMED.