United States Court of Appeals,

Fifth Circuit.

No. 94-10948.

Dudley WARDLAW, Plaintiff-Appellee-Cross-Appellant,

v.

INLAND CONTAINER CORPORATION, et al., Defendants,

Anheuser-Busch, Inc., Defendant-Appellant-Cross-Appellee.

March 13, 1996.

Appeals from the United States District Court for the Northern District of Texas.

Before HIGGINBOTHAM, EMILIO M. GARZA and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

Defendant-appellant/cross-appellee Anheuser-Busch ("Anheuser") appeals from a jury verdict awarding plaintiff-appellee/cross-appellant Dudley Wardlaw ("Wardlaw") damages for tortious interference with his employment. Wardlaw cross-appeals, arguing that the district court erred in granting Anheuser judgment as a matter of law on the issue of punitive damages. We reverse the district court's denial of Anheuser's motion for judgment as a matter of law, and affirm its judgment on the issue of punitive damages.

I. Background

Wardlaw was employed as a National Account Service Executive for Inland Container Corp. ("Inland"), which manufactures corrugated paper products. Anheuser was one of Inland's customers. Wardlaw successfully developed a quality and service program for Anheuser. As a result of his work on the Anheuser account, Wardlaw

1

had access to information regarding the volume of Inland's business with Anheuser.

On January 20, 1990, Wardlaw wrote a letter to Roger Stone of Stone Container Corporation ("Stone"), an Inland competitor, expressing interest in acting as a consultant for Stone. In the letter, Wardlaw described his success with the Anheuser account, including information about the volume of products that Anheuser bought from Inland and the amount of revenues the account was generating. Wardlaw indicated that Stone should call Anheuser to confirm that Wardlaw's efforts had fostered Inland's growth.

Jim Riley, an employee of Stone, contacted Bob Scheetz, Anheuser's purchasing agent for corrugated materials, on April 4, 1990 to determine whether Wardlaw had achieved the results described in his letter. Scheetz requested a copy of the letter, which was faxed the same afternoon. After reviewing the letter, Scheetz realized that Wardlaw was communicating volume and revenue information that Anheuser considered confidential. Scheetz immediately called Ron Dailey, Inland's sales representative for Anheuser, and expressed his concern over the release of the information. Scheetz did not request that any action be taken against Wardlaw or that the letter be reported to Wardlaw's supervisors.

Dailey met with Wardlaw later that day and informed him that Anheuser had a copy of the letter. Wardlaw became concerned that the contents of the letter might be divulged to Inland's management executives because various Inland and Anheuser representatives were

2

planning a golf trip together in the near future. He decided that he should disclose the letter to his supervisor, Steve Raine. After Raine received a copy of the letter, he sent it to Jim Cory, Inland's Senior Vice President of Sales and Marketing, who placed Wardlaw on administrative leave pending investigation of his actions.

On April 12, 1990, Wardlaw was terminated for violating Inland's Anti-Trust Compliance Policy and for offering to use customer contacts he had acquired at Inland to influence major customers to conduct business with Stone. After the termination, Inland called several of its customers, including Anheuser, to inform them that Wardlaw was no longer employed with Inland.

Wardlaw filed suit against Inland, alleging that his termination violated the Age Discrimination in Employment Act and the Employee Retirement Income Security Act. Wardlaw subsequently sued Anheuser, alleging that Anheuser had tortiously interfered with Wardlaw's employment contract. On August 22, 1992, Wardlaw settled his claims against Inland.

After a jury trial, Wardlaw was awarded $390,000 in actual damages for tortious interference and $1 million in punitive damages. The district court granted Anheuser's motion for judgment as a matter of law on the punitive damages issue, but denied Anheuser's motion on the actual damages issue and its motion for new trial.

## II. Anheuser's Appeal

Anheuser initially attacks the district court's denial of its

motion for judgment as a matter of law, contending there was no evidence to support the jury's finding that Anheuser tortiously interfered with Wardlaw's employment contract and the evidence overwhelmingly indicates that Anheuser's actions were privileged. In reviewing a district court's disposition of a motion for judgment as a matter of law, this Court applies the same test the district court applied, without any deference to its decision. *Little v. Republic Ref. Co., Ltd.,* 924 F.2d 93, 95 (5th Cir.1991). The applicable test provides:

> [T]he Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. *If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper.* On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied....

*Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (emphasis added).[1]  A conflict in substantial evidence must exist to create a jury question.  *Id.* at 375.

To establish a claim for tortious interference, a plaintiff must prove:   (1) the existence of a contract subject to interference;  (2) willful and intentional interference with that contract;  (3) the intentional interference was a proximate cause of plaintiff's damage;  and (4) actual damage or loss occurred.

---

[1]In a diversity case, federal law governs the standard of review for sufficiency of the evidence.  *Gibralter Sav. v. LDBrinkman Corp.,* 860 F.2d 1275, 1291 (5th Cir.1988), *cert. denied,* 490 U.S. 1091, 109 S.Ct. 2432, 104 L.Ed.2d 988 (1989).

4

*Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 939 (Tex.1991). In the instant cause, Anheuser specifically attacks the jury's findings with respect to the intentional interference and proximate cause elements of Wardlaw's tortious interference claim. Anheuser also complains of the district court's rejection of its privilege defense.

*A. Intent and Proximate Cause*

Intentional interference does not require an intent to injure, only that "the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it." *Southwestern Bell Tel. Co. v. John Carlo Tex., Inc.,* 843 S.W.2d 470, 472 (Tex.1992) (citing *Restatement (Second) of Torts* § 8A (1965)).[2] "Substantially certain" requires that the interference be "incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action." *Southwestern Bell Tel. Co. v. John Carlo Tex., Inc.,* 813 S.W.2d 613, 619 (Tex.Ct.App.1991), *rev'd on other grounds,* 843 S.W.2d 470 (Tex.1992) (quoting *Restatement (Second) of Torts* § 766 cmt. j. (1965)). In short, Wardlaw had to prove that Anheuser intended to

---

[2]Wardlaw argues that the test for intent is whether Anheuser committed acts that were calculated to cause damage to Wardlaw in his lawful business. We disagree. In *John Carlo,* the Houston Court of Appeals expressly disapproved of this definition to the extent that it means intent to cause harm is a required element of tortious interference. *See Southwestern Bell Tel. Co. v. John Carlo Tex., Inc.,* 813 S.W.2d 613, 619 (Tex.Ct.App.1991). The Texas Supreme Court agreed, concluding that intentional interference does not require an intent to injure, only an intent to cause interference or a substantial certainty that interference will occur. *See John Carlo,* 843 S.W.2d at 472.

interfere with Wardlaw's employment or was substantially certain that such interference would result from Scheetz's telephone call to Dailey. Wardlaw also had to prove that such interference was a proximate cause of Wardlaw's termination. *See Travis v. City of Mesquite,* 830 S.W.2d 94, 98 (Tex.1992) (proximate cause consists of cause in fact and foreseeability).

Although we perceive the issue to be close, an examination of the evidence reveals that the facts and inferences would permit reasonable jurors to conclude that Anheuser's interference was intentional. The evidence presented raised a conflict sufficient to create a jury question on the issue of intent. *See Boeing,* 411 F.2d at 375.

Wardlaw relies on two principle pieces of evidence to support his claim of tortious interference. One piece of evidence involves a phone call between Scheetz and Dailey that occurred in March, approximately two or three weeks before the phone call regarding Wardlaw's dissemination of confidential information. During this conversation, Scheetz mentioned that he had heard that Wardlaw was interested in a position with Stone. Wardlaw argues that Scheetz released this information despite Wardlaw's request in his letter to Stone that his interest in a consulting position not be betrayed. The evidence indicates, however, that Scheetz's disclosure was an offhand comment in the course of a regular conversation with Dailey, made long before Scheetz was aware of the

6

letter to Stone.[3]

The second piece of evidence Wardlaw points to is the comment of Jerry Lamm, Anheuser's group manager for packaging, when Cory informed him that Wardlaw had been terminated: "I hope Anheuser-Busch's involvement with the letter to Richard Stone had nothing to do with it." Lamm also admitted that upon hearing about Wardlaw's termination, he knew immediately that Wardlaw would not have been fired if Scheetz had not called Inland.

Although Lamm and Scheetz each testified that Anheuser's sole purpose was to prevent future dissemination of the confidential information, Scheetz admitted during trial that he never contacted

---

[3]This first conversation occurred in early March. On April 4, 1990, Scheetz contacted Dailey to inform him that Wardlaw had released confidential information to Stone. Scheetz testified that Riley called him that same day about the letter, that upon learning about the confidential content he requested a copy, Riley faxed him a copy a few hours later, he immediately called Dailey, and then met with his supervisor, Jerry Lamm, to discuss the situation.

The parties point to no evidence to show that Scheetz was aware of the letter or its contents before April 4. Thus, we fail to see how Scheetz deliberately betrayed Wardlaw's interest in a consulting job with Stone when he was unaware that Wardlaw wanted that information kept confidential at the time he revealed it to Dailey. Wardlaw admits as much in his brief in discussing punitive damages when he asserts that "the key evidence of ABC's intent to damage (injure) Wardlaw was that *long before Scheetz was even aware of the contents of Wardlaw's letter, he told Ron Dailey that Wardlaw was looking for a job with Stone, a competitor.*" (Emphasis added.) Wardlaw is apparently trying to have it both ways, arguing on the one hand that Scheetz knew Wardlaw did not want the information that he was looking for a job betrayed based on Wardlaw's letter, and on the other hand that Scheetz was deliberately trying to get Wardlaw terminated long before he knew the contents of the letter. We must presume therefore that Scheetz mentioned Wardlaw's interest in a consulting position before he was aware of the letter or of Wardlaw's desire that his interest in employment with Stone not be betrayed.

7

Wardlaw to prevent future dissemination, nor did he request that Stone destroy its copy. Scheetz conceded that if he had made such a request, Stone would have complied. Various Inland employees testified that Anheuser did not request that Inland prevent further dissemination by destroying all copies of the letter. After Wardlaw was terminated, Scheetz and Lamm did nothing more to prevent the dissemination.

As to proximate cause, Anheuser argues that Scheetz's phone call was not a proximate cause of Wardlaw's termination; rather, Wardlaw's action in giving the letter to Raine and his violation of Inland's anti-trust policies caused his termination. Anheuser asserts that it did not turn the letter over to anyone at Inland, did not reveal or threaten to reveal the letter to Inland executives, and exerted no pressure over Inland to terminate Wardlaw. Various Inland employees testified that Wardlaw was not terminated as a result of any pressure from Anheuser, but because he had violated Inland's own policies and used information and contacts that he obtained while an employee of Inland to Inland's possible detriment.

Wardlaw points to the two phone calls from Scheetz to Dailey as proximate causes of his termination. During the first phone call, Scheetz mentioned that Wardlaw was applying for a job with Stone. The record indicates, however, that this phone call was not a proximate cause of Wardlaw's termination. Dailey described Scheetz's comment as "Oh, by the way, I hear through the grapevine that Dudley is looking for a job at Stone Container." Dailey then

8

asked Wardlaw about his job search, and Wardlaw admitted he was seeking a consulting position so that he could spend more time on an invention. Dailey testified that he did not tell anyone else at Inland that Wardlaw was seeking a position at Stone. Wardlaw presented no evidence that this phone call formed the basis of his termination. Wardlaw has thus failed to carry his burden of proof to establish that this phone call was a proximate cause of his damages.

Wardlaw correctly asserts, however, that there was some evidence that the second phone call, which concerned the release of confidential information, was a proximate cause of his termination. The phone call was a substantial factor in bringing about Wardlaw's termination, without which the harm would not have occurred. *See Travis,* 830 S.W.2d at 98.

Moreover, it was foreseeable that this phone call could result in interference with Wardlaw's employment relationship with Inland. Scheetz testified that he informed Dailey about the letter because he expected Dailey to ensure that the release of information would cease. He also stated that he was not surprised when he heard that Wardlaw had met with his supervisor, Raine. Scheetz also admitted that informing a company that its employee has done something wrong is a serious matter for the employee accused of the wrongdoing. In addition, Lamm testified that upon learning that Wardlaw had been terminated, he knew instantly that Wardlaw would not have been terminated if Scheetz had not called Inland. Evidence admitted at trial indicated that Anheuser was upset about the release of

9

confidential information. Jim Cory, Inland's vice president of sales, wrote a memo on April 4, 1990, which stated that Anheuser had informed Dailey that it was not very happy about the letter.

We agree with Anheuser that the evidence of intent and proximate cause[4] is much less compelling in the instant cause than the fact scenarios presented in the various Texas cases. *See Victoria Bank & Trust,* 811 S.W.2d at 940 (bank retained security interest after plaintiff paid off secured debt and then asserted the security lien when plaintiff attempted to cash a draft at the bank, refusing to pay until plaintiff agreed to deduct $40,000 from the draft proceeds to apply to a disputed note); *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 688 (Tex.1989) (oil company directed contractor to fire plaintiff because plaintiff had once sued oil company); *Sakowitz, Inc. v. Steck,* 669 S.W.2d 105, 107 (Tex.1984), *overruled in part by Sterner,* 767 S.W.2d at 690 (Sakowitz wrote letter to former employee's new employer asking that it honor the non-competition agreement former employee signed by firing employee); *John Carlo,* 813 S.W.2d at 616-17 (plaintiff sued telephone company for delays in performance of plaintiff's contract with the city resulting from company's failure to timely relocate its utilities, despite being informed that relocation was necessary); *Exxon Corp. v. Allsup,* 808 S.W.2d 648, 651 (Tex.Ct.App.1991, writ denied) (gas company, which was aware of

---

[4]Although Anheuser correctly asserts that Wardlaw's discussion of the letter with Raine was also a proximate cause, Texas law recognizes the existence of concurrent proximate causes. *See Travis,* 830 S.W.2d at 98. All individuals whose actions contribute to the injury, proximately causing the injury, are liable. *Id.*

10

employee's lifetime contract as guard for ranch, told subcontractor not to rehire employee at some point after it took over operations of ranch's gate).

It is not this Court's function, however, to weigh conflicting evidence and inferences, or to assess the credibility of the witnesses. *See Boeing,* 411 F.2d at 375. Rather, our role is merely to ensure that a substantial conflict existed in the evidence to create a jury question. *Id.* Scheetz's knowledge that some action would be taken in response to his phone call, his admission that informing an employer that an employee had engaged in wrongdoing could have detrimental effects on the employee, his failure to request that all copies of the letter be destroyed, Lamm's statement that he hoped Anheuser's involvement with the letter did not cause Wardlaw's termination, and Lamm's testimony that he knew as soon as he heard about the termination that Wardlaw would not have been fired if Scheetz had not called Inland provide some evidence from which a jury could conclude that the elements of intent and proximate cause were satisfied.

Viewing the evidence and the permissible inferences to be drawn from it, we are loathe to declare that under such circumstances no reasonable jury could have found that Anheuser intentionally interfered with Wardlaw's employment and that its actions proximately caused Wardlaw's termination. *See Boeing,* 411 F.2d at 374. Accordingly, we reject Anheuser's attack on the intent and proximate cause elements of Wardlaw's alleged cause of action.

11

*B. Privilege*

Anheuser contends that Wardlaw is not entitled to recover for tortious interference because Anheuser's actions were legally justified. Anheuser is privileged to interfere in the contract of another if it is done in a bona fide exercise of Anheuser's own rights or if Anheuser has an equal or superior right in the subject matter to that of the other party. *Sterner,* 767 S.W.2d at 691. A party may assert the privilege "even though that claim may be doubtful, so long as it asserts a *colorable* legal right." *Sakowitz,* 669 S.W.2d at 107 (emphasis added).

Legal justification is an affirmative defense upon which Anheuser bears the burden of proof. *Victoria Bank & Trust,* 811 S.W.2d at 939. Because Anheuser is appealing the district court's failure to grant judgment as a matter of law on the ground of privilege, Anheuser must show that it presented evidence so strongly and overwhelmingly in favor of a privilege that a reasonable jury could not have reached a contrary verdict. *See Boeing,* 411 F.2d at 374.

The Texas Supreme Court recently clarified the law on legal justification. In *Texas Beef Cattle Company v. Green,* the court held that good faith is irrelevant if the evidence establishes a legal right to interfere: "[I]f the trial court finds as a matter of law that the defendant had a legal right to interfere with a contract, then the defendant has conclusively established the justification defense and the motivation behind assertion of that right is irrelevant." 39 Tex.S.Ct.J. 194, 1996 WL 11237, at *7

12

(Tex. Jan. 11, 1996) (citations omitted).  Although prior supreme court precedent indicated that "the defense of legal justification or excuse only protects good faith assertions of legal rights," *Victoria Bank & Trust,* 811 S.W.2d at 939, the court in *Green* rejected the assertion that actual malice could vitiate the privilege.  *Green,* 1996 WL 11237, at *9.  Good faith, however, remains an essential element where the defendant asserts only a colorable legal claim.  *Id.* at *7.

During trial, Anheuser's purchase order agreement with Inland was admitted in evidence.  The agreement provided that "[v]endor will not, without [b]uyer's prior written consent, *advertise or publish in any manner* that it has furnished or contracted to furnish to [b]uyer the goods or services specified herein." (Emphasis added.)  Wardlaw admitted that he did not seek Anheuser's permission before disseminating the volume information to Stone.

Upon discovering Wardlaw's disclosure, Scheetz called Dailey to complain of the release of volume information, which Anheuser regarded as confidential based upon the purchase order agreement and Anheuser's treatment of the information.  The purchase order agreement gave Anheuser a legal right to complain about the release because Wardlaw's dissemination violated the agreement's express terms.  Scheetz's phone call to Inland represented Anheuser's total involvement in the events precipitating Wardlaw's termination. Anheuser's action (the interference) was reasonable and wholly consistent with protecting its right of confidentiality.  Because the evidence clearly established that Anheuser had a legal right to

13

complain of Wardlaw's disclosure, Anheuser's assertion of that right through Scheetz's call to Dailey was entitled to the privilege. Anheuser was not required to prove that the right was asserted in good faith. *Id.* Anheuser was entitled to a dismissal of the claim against it based upon its legal right to interfere.

Even were we to conclude that the purchase order agreement was insufficient to establish Anheuser's legal right to interfere as a matter of law, we would nevertheless conclude that Anheuser overwhelmingly proved the existence of a good faith assertion of a colorable legal right. The evidence at trial indicates that Anheuser considered the information confidential and took steps to prevent its dissemination. Anheuser did not release information regarding a supplier's volume to any other supplier. Inland employees Dailey, Cory, and Raine testified that Anheuser kept information about the volume from various competitors confidential. Riley, a Stone employee, testified that Anheuser did not release volume information and that no one at Anheuser had ever given him this type of information. Additionally, the purchase order agreement provided for confidentiality.

Although Wardlaw testified that volume information was not confidential because it was not related to pricing, Wardlaw had no personal knowledge of Anheuser's practice of keeping volume information confidential. Indeed, Wardlaw's testimony is apparently premised on Inland's policies concerning confidentiality, not Anheuser's. Wardlaw failed to offer any evidence to counter the testimony of various witnesses that

14

Anheuser considered this type of information confidential.[5]  We conclude that Anheuser established that it considered the information confidential, and acted on its right to protect that confidentiality.  Thus, Anheuser at the very least established a colorable legal right to interfere.

If Anheuser's interference was a bona fide exercise of its right to protect confidentiality, it is entitled to the privilege. *See Green,* 1996 WL 11237, at *9; *Victoria Bank & Trust,* 811 S.W.2d at 939.  The evidence indicates that Anheuser never requested that any action be taken against Wardlaw, did not talk to any Inland executives about Wardlaw's letter, and called Inland because Wardlaw was an Inland employee.  This evidence sharply contrasts with Texas cases in which the courts have concluded that the defendant's interference was not legally justified. *See Victoria Bank & Trust,* 811 S.W.2d at 940 (bank failed to release its security interest in plaintiff's cattle after plaintiff paid off secured debt and then asserted the security interest when plaintiff sold the cattle); *Sterner,* 767 S.W.2d at 690 (defendant directed that employee be fired by subcontractor despite the fact that employee's performance had been satisfactory); *Allsup,* 808 S.W.2d at 657-58 (defendant directed that subcontractor not rehire plaintiff based on his failure to perform a job requirement, even

---

[5]Wardlaw relies on Riley's testimony that he might be able to figure out an approximate volume for other breweries based on visits to Anheuser because he could see the boxes from different breweries.  Riley admitted, however, that his estimation would be based upon his own observations and extrapolation, and that no one at Anheuser would have provided him with this information.

15

though defendant knew a variance had been granted so that plaintiff would not have to perform). Wardlaw violated what Anheuser regarded as its right to confidentiality regarding volume information. Anheuser understandably reacted to this violation by contacting Inland.

Wardlaw nonetheless asserts that Anheuser's interference was not a bona fide exercise because it did not attempt to prevent further dissemination. Wardlaw relies on the fact that Anheuser neither requested that Wardlaw or Stone turn over all copies of the letter nor contacted Wardlaw to ensure that he would not disseminate the information further. Wardlaw asserts that Anheuser simply informed Inland that it was displeased with the release of confidential information. Implicit in this statement, however, is the inference that Anheuser does not want this type of release to occur again.[6]

Despite Wardlaw's emphasis on actions Anheuser *could have* taken when it discovered that confidential information had been released, Texas law does not engage in this type of examination

---

[6]Wardlaw also argues that the first phone call, in which Scheetz mentioned that Wardlaw was seeking other employment, was not done in a bona fide exercise of Anheuser's rights. We have concluded, however, that this phone call was not a proximate cause of Wardlaw's termination. Because legal justification is an affirmative defense, we do not reach the issue of privilege unless we first determine there was tortious interference. *See Sterner,* 767 S.W.2d at 689-90 (party asserting the privilege admits interference occurred, but seeks to avoid liability based upon a claimed interest that is being impaired or destroyed). Wardlaw did not establish one of the necessary elements of tortious interference. *See Victoria Bank & Trust,* 811 S.W.2d at 939. Thus, Anheuser did not have to prove that it was legally justified in making this phone call.

when analyzing good faith.[7]  The Texas cases do not focus on what the defendant could have done or might have done;  rather, they look at what the defendant *actually did* in assessing good faith. *Victoria Bank & Trust,* 811 S.W.2d at 940;  *Sterner,* 767 S.W.2d at 691;  *Allsup,* 808 S.W.2d at 657-58;  *International Bank of Commerce v. Union Nat'l Bank,* 653 S.W.2d 539, 549 (Tex.Ct.App.1983, writ ref'd n.r.e.).

We conclude that Anheuser's assertion of its right was bona fide and that no reasonable jury could find otherwise.  All evidence indicated that Anheuser kept volume information confidential, refused to release information on suppliers to their competitors, and considered volume information important as a negotiating tool.  Upon learning that this information had been released by an Inland employee, despite Anheuser's purchase order agreement and conversations with Inland that this type of information was confidential, Anheuser called its normal contact at Inland, Dailey, to inform him of the release.

Anheuser clearly had a well-grounded and justifiable belief that the information was confidential. *See Sakowitz,* 669 S.W.2d at 107.  Its phone call to Inland was a bona fide exercise of that right because Inland was the party with whom it had an understanding that such information would not be released.  To conclude otherwise would effectively destroy the privilege of legal

---

[7]Wardlaw repeatedly asserts that Anheuser should have contacted him and should have fought to have him rehired once it became aware of his termination.  Anheuser was under no legal obligation to take such actions and, thus, its failure to do so provides no indication that Anheuser acted in bad faith.

justification.  The district court erred in denying the motion for judgment as a matter of law on the issue of legal justification. *See Boeing,* 411 F.2d at 374.  Because Anheuser established legal justification for its actions, Wardlaw is precluded from recovering on his asserted claim of tortious interference.[8]

### III. Wardlaw's Cross-Appeal:  Punitive Damages

Wardlaw complains on cross-appeal of the district court's order denying him recovery for punitive damages.  Our holding that Wardlaw cannot recover compensatory damages for tortious interference precludes his recovery for punitive damages.  *See Federal Express Corp. v. Dutschmann,* 846 S.W.2d 282, 284 (Tex.1993);  *Hadley v. VAM P T S,* 44 F.3d 372, 375 (5th Cir.1995) (finding of actual damages is a prerequisite to the receipt of punitive damages under Texas law).  The district court did not err in denying Wardlaw punitive damages.

### CONCLUSION

For the foregoing reasons, we reverse the judgment of the district court awarding Wardlaw damages for tortious interference and affirm the district court's denial of punitive damages. Wardlaw's claim is dismissed with prejudice.

AFFIRMED IN PART;  REVERSED AND RENDERED IN PART.

---

[8]Our disposition of Anheuser's claim of legal justification renders our consideration of its other claims of error unnecessary.

18