In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-09-00012-CV

                                                ______________________________

 

 

     CHARLES M. CHAMBERS AND JULIANN S. CHAMBERS,
Appellants

 

                                                                V.

 

                                       EQUITY BANK, SSB, Appellee

 

 

                                                                                                  


 

 

                                      On Appeal from the 402nd
Judicial District Court

                                                             Wood County, Texas

                                                          Trial Court
No. 2005-373

 

                                                                                                   

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                                    Opinion by Chief Justice Morriss








                                                                   O P I N I O N

 

            Unknown to Charles
M. Chambers, when he passed by the Lighthouse Resort on Lake Fork on a weekend
fishing trip in early 2004 and noticed the “for sale” sign, was the fact that lurking
beneath the resort’s surface was a damaged or defective septic system.  It is not disputed that, in April 2004, when
Charles M. and Juliann S. Chambers (herein Chambers) executed a contract to buy
the resort from Franklin National Bank (now Equity Bank, SSB),[1]
Chambers did not know either that there were problems with the septic system or
that the Bank knew of those problems. 
Disputed issues at trial and on appeal involve when Chambers learned of
the septic system problems and of the Bank’s knowledge of those problems,[2]
whether Chambers proceeded with the purchase of the resort[3]
with such knowledge, and what effect those developments have on Chambers’ fraud
claim against the Bank arising from the sale.

            The
sequence of events is helpful to an understanding of the issues. 

 

            A
“pre-closing” of the Lighthouse property took place June 28, 2004, at which
time various, but not all, closing documents were signed; none were filed for
record at that time.  At that time,
Chambers signed a promissory note for $650,000.00, the Bank gave Chambers the
keys to the Lighthouse property along with $15,000.00 for operating expenses,
and Chambers began cleaning up the property. 
Chambers did not pay any part of the sales price on June 28 and admits
that the property was not purchased on that date. 

            On June 29,
2004, Chambers was advised by the Sabine River Authority of the problem with
the septic system. 

            As a result,
Chambers and the Bank entered into an amended contract July 20, 2004, which
provided that the Bank was to repair the septic system for an allowance not to
exceed $32,000.00.[4]  While many of the closing documents had been signed
by Chambers June 28, 2004, the warranty deed conveying the real estate and the bill
of sale conveying title to the personal property were not signed by the Bank
until July 20, 2004, the deed of trust was not recorded until July 22, 2004,
and no monies were paid by Chambers or disbursed by the Bank from the SBA loan
until the contract amendment was signed. 


            Before
the septic-system repairs could be made, Chambers filed for bankruptcy and
stopped making payments on the note to the Bank.  

            The
Bank foreclosed on the property and sued Chambers for the remaining deficiency
on the loan.  Chambers thereafter filed
suit against the Bank for fraud and real estate fraud.  The two cases were consolidated and tried to a
jury. 

            The jury
found in favor of Chambers on the fraud claims and assessed damages, exemplary
damages, and attorney’s fees.  Damages
were awarded in the amount of $68,583.73, representing the net consideration
paid by Chambers to the Bank; $36,840.00 in attorney’s fees, costs of septic
pumping, and value of inventory lost due to foreclosure; and $175,000.00 in
exemplary damages.  In addition, the jury
answered question number eight on ratification in favor of the Bank, finding
that Chambers ratified the fraud.  On the
Bank’s motion, the trial court entered judgment in favor of the Bank in the
amount of its deficiency claim of $219,415.17. 


            Chambers
appeals.  We affirm the judgment of the
trial court because (1) Chambers waived any claim of defect in the instruction
given to the jury on ratification, (2) the evidence is legally and factually
sufficient to support the jury’s finding of ratification, and (3) the trial
court correctly disregarded the jury’s answers to all questions except question
number eight.

(1)        Chambers Waived any Claim of Defect in
the Instruction on Ratification 

 

            In
connection with a question submitting the Bank’s ratification defense, the jury
was instructed that ratification occurs when one affirms an existing contract
or enters a new one after becoming “aware of the fraud.”  Specifically, the jury was instructed:

In answering this question,[5] you
are instructed that ratification occurs if a defrauded party enters into a new
agreement or otherwise affirms the contract and recognizes the contract as
subsisting after becoming aware of the fraud.

 

At the charge conference, counsel for Chambers made the
following objection to this question and instruction:

Plaintiffs object to Question No. 8 on the basis
that there is no evidence to support the submission of such an issue to the
jury, or in the alternative, the evidence is insufficient as a matter of law to
support the submission of this issue to the jury, and a yes answer to that
question would not be supported by sufficient evidence.  We’re also objecting to that on the basis that
there is no authority cited for the contents of the ratification instruction
that accompanies that issue.

 

            The Bank
contends Chambers’ complaint of charge error—that the instruction is a
misstatement of Texas law—has been waived. 
As a threshold issue, we examine whether Chambers waived this complaint.  Our procedural rules state that any complaint
to a jury charge is waived unless specifically included in an objection.

A party objecting to a charge must point out
distinctly the objectionable matter and the grounds of the objection.  Any complaint as to a question, definition,
or instruction, on account of any defect, omission, or fault in pleading is
waived unless specifically included in the objections.

 

Tex. R. Civ. P.
274.

 

            To preserve
error in a defective instruction, the complaining party must specifically
object, clearly identify the error, and explain the grounds for the objection.  In re
B.L.D., 113 S.W.3d 340, 349 (Tex. 2003); Spencer v. Eagle Star Ins. Co., 876 S.W.2d 154, 157 (Tex. 1994).  The offending language must be identified with
sufficient precision to apprise the trial court of just what makes the
submission erroneous and of what corrective action might be taken.  B.L.D.,
113 S.W.3d at 349–50.   Further, the grounds
supporting an objection made during trial must conform to the argument
supporting the corresponding point of error on appeal.  Exxon
Corp. v. Allsup, 808 S.W.2d 648, 655 (Tex. App.—Corpus Christi 1991, writ
denied).  Accordingly, an objection made
during trial which is different from the argument urged on appeal presents
nothing for appellate review.  Borden, Inc. v. Guerra, 860 S.W.2d 515,
525 (Tex. App.—Corpus Christi 1993, writ dism’d by agr.).

            To complain
on appeal that the instruction misstates the law, Chambers must have made such
an objection at trial, specifically pointing out the objectionable matter and
the grounds for the objection.  See Bryant
v. Transcontinental Gas Pipe Line Corp., 821 S.W.2d 187, 189 (Tex. App.—Houston
[14th Dist.] 1991, writ denied).  Aside
from a legal sufficiency complaint, Chambers’ sole complaint at trial regarding
the instruction on ratification was:  “there
is no authority cited for the contents of the ratification instruction that
accompanies that issue.”  This objection
fails to challenge the text of the instruction and does not identify anything
about the instruction that might be suspect; there is no claim that the instruction
is improper.  The objection here does not
communicate to the trial court the claim that the proposed instruction is a
misstatement of Texas law, as is alleged on appeal.  Chambers’ complaint on appeal is precisely
targeted and asserts that the instruction’s use of the phrase “became aware of
the fraud,” rather than “full knowledge of the fraud and all material facts” is
a misstatement of Texas law.  No such
argument was made to the trial court.

            “Important
prudential considerations underscore our rules on preservation.  Requiring parties to raise complaints at
trial conserves judicial resources by giving trial courts an opportunity to
correct an error before an appeal proceeds.” 
B.L.D., 113 S.W.3d at 350.  Because Chambers’ objection to the trial
court did not state, or even imply, that the ratification instruction misstates
the law, no error on this issue was preserved for our review.  We do not address whether the instruction on
ratification was a misstatement of Texas law.  We overrule this point of error.

(2)                 The Evidence Is Legally and Factually Sufficient to
Support the Jury’s Finding of Ratification

 

            Ratification
is an affirmative defense that the defendant must prove.  Lesikar
v. Rappeport, 33 S.W.3d 282, 300 (Tex. App.—Texarkana 2000, pet. denied).  Because Chambers did not have the burden of
proof on this issue and is challenging the legal sufficiency of the jury’s
finding, we consider all of the evidence in the light most favorable to the
prevailing party, indulging every reasonable inference in that party’s
favor.  Associated Indem. Corp. v. CAT Contracting, Inc., 964 S.W.2d 276,
285–86 (Tex. 1998).  We are to consider
the evidence and inferences that tend to support the finding and disregard all
evidence and inferences to the contrary. 
Bradford v. Vento, 48 S.W.3d
749, 754 (Tex. 2001).  If there is more
than a scintilla of evidence to support the finding, we must uphold it.  Associated
Indem. Corp., 964 S.W.2d at 285–86.  “More
than a scintilla of evidence exists if the evidence ‘rises to a level that
would enable reasonable and fair-minded people to differ in their
conclusions.’”  Ford Motor Co. v. Ridgeway, 135 S.W.3d 598, 601 (Tex. 2004)
(quoting Merrell Dow Pharms., Inc. v.
Havner, 953 S.W.2d 706, 711 (Tex. 1997)). 
Conversely, evidence is no more than a scintilla when it is so weak that
it amounts to nothing more than mere surmise. 
Id.

            When
considering a factual sufficiency challenge to a jury’s finding, we must
consider and weigh all the evidence, not just that evidence which supports the
verdict.  Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402, 406–07 (Tex.
1998).  We will set aside a verdict only
when it is so contrary to the overwhelming weight of the evidence that the
verdict is clearly wrong and unjust.  Id.; Pool
v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986); Lesikar, 33 S.W.3d at 300.

            The fraud found by the jury
concerns the Bank’s failure to inform Chambers about the condition of the
septic system.  The question here is
whether there is sufficient evidence that Chambers ratified that fraud.  The court’s instruction to the jury in
Question No. 8 was:

In answering this question, you are instructed
that ratification occurs if a defrauded party enters into a new agreement or
otherwise affirms the contract and recognizes it as subsisting after becoming
aware of the fraud.

 

            Answer “Yes” or “No”

 

            ANSWER:  Yes

 

            Ratification
occurs when the parties’ obligations are adjusted after the defrauded party
learns of the fraud.  Wise v. Pena, 552 S.W.2d 196, 199 (Tex.
Civ. App.—Corpus Christi 1977, writ dism’d). 
An agreement is also ratified if a party, by word or conduct, affirms
the agreement after becoming aware of any fraud that would otherwise impair the
agreement.  Formosa Plastics Corp., USA v. Kajima Int’l, Inc., 216 S.W.3d 436,
456 (Tex. App.—Corpus Christi 2006, pet. denied).  That is, ratification occurs whenever the
parties act in a way that recognizes, in spite of the revealed fraud, the
existence of a binding contract.  Id. at 456.

            In
this case, the evidence shows that, after Chambers learned of the fraud, the
purchase of the property was completed,[6]
including the signing of an amended contract of sale expressly addressing the
matter at the heart of the fraud allegation—repair of the septic system—at a
cost to the Bank of $32,000.00. 
Chambers’ testimony on this issue is as follows:

            Q.        [By Mr. Young]:  Did you have any verbal communication with
anybody at the bank?

 

            A.        I did. 
I told Paul Lester that this needed to get fixed or I wasn’t going to
give him my $100,000 down payment when I had it.

 

            Q.        Did anybody at the bank, starting on
June the 28th of ’04 or 29th of ’04 when you found out about it - - and I think
the next significant date is probably going to be July the 20th, when they had
this meeting at the bank - - did anybody at the bank during that period of time
ever admit to you that they knew that there was a problem with the septic
system at the Lighthouse prior to your contract?

 

            A.        Yes. 
Paul Lester told me personally, I’m sorry, we should have told you about
that, we know about it, it’s no big deal, there is a pipe missing and we’re
going to hook it up for you, no problem no cost to you whatsoever, and David
knows about it, he’s already got a contractor to do it.

 

            . . . .

                                                

            Q.        [By Mr. Cothren]:  Now, when you were [sic] received this letter
from Weldon Griffith, the person that you had go out and do the engineering
study or come up with a bid on June 29th of 2004, did you provide a copy of
that quote, if you will, from Weldon Griffith saying it’s going to cost
somewhere from 35, 39,000 to 52,000?

 

                        A.        Did I provide a copy of that?

 

                        Q.        Yeah, to the bank.

 

                        A.        Yes, I did.

 

            . . . .

 

            Q.        [By Mr. Cothren]:  You actually went into the bank with a copy
of that and told them, you’re going to have to do something about this or I’m
not coming up with the $100,000?

 

            A.        I don’t really recall that, but somehow
or another I did tell them that, by the phone or in person, I don’t recall.

 

            Q.        Okay.
 So when you had that report that was
done for you, had knowledge about the septic problems and everything, you went
into the bank with the report telling them that, we’ve got to work something
out here or you’re going to have to do something or I’m not coming up with the
$100,000 at closing; isn’t that correct?

 

            A.        That’s
correct.

 

            Q.        And
at that point is when the negotiations began for the amendment of the contract
which was signed June [sic] July 20th, 2004; is that correct?

 

            A.        I
guess.  I object to the word
negotiate.  There were no
negotiations.  They gave me a figure that
they would fix it for that [sic] and that was that.

 

            Q.        Well,
did you tell them, that figure is not acceptable and I’m going to have go [sic]
with Weldon Griffith’s figure of 39,000 to 52,000?

 

            A.        No.  They had Weldon Griffith’s letter and they
had told me that they had a contractor in my pocket, is the exact phrase that
Paul Lester used, that Dave Coe has a contractor in his pocket that will do it
for this amount of money.

 

            .
. . .

 

            Q.        [By
Mr. Cothren]:  You did agree to the
contract amendment, sir, that says there will be an allowance of up to a
maximum of $32,000; isn’t that correct?

 

            A.        That’s
what the contract says, yes.

 

            Q.        And
that’s the contract you signed?

 

            A.        I
signed it.  

 

            . . . .

 

            Q.        [By
Mr. Cothren]:  So you knew when the contract
amendment was signed, that if the cost of the septic system exceeded $32,000,
that you would be responsible for payment of that excess; am I correct?

 

            A.        Yes.

 

            In spite of
the foregoing testimony, Chambers claims there was no affirmation of the contract
or recognition of the contract as subsisting after he became aware of the
fraud.  This is so, he claims, because
the closing papers were signed June 28, 2004, before he knew about the fraud,
that the amendment was to get the Bank to fix the septic system, that he was
told by the Bank that he could not back out of the deal, and that he had
already been given a deed and keys to the property June 28, 2004.    

            Under the
sales contract, Abstract Services, Inc., of Emory was to serve as escrow
agent.  The contract provided that
Chambers was to deposit $100,000.00 with the Bank as a condition of the
sale.  Apparently, both Chambers and the
Bank wanted to sign the closing documents and allow Chambers to take possession
of the property before Chambers was able to make the $100,000.00 deposit with
the Bank.  Chambers wanted to take
possession prior to the July 4th weekend and the Bank, which was being sold,
wanted the property listed as having already been sold before its sale took
place.  

            While many
of the closing documents were signed by Chambers June 28, 2004, the warranty
deed was not signed by the Bank until July 20, 2004, the deed of trust was not
recorded until July 22, 2004, the bill of sale conveying title to the personal property
was not signed by the Bank until July 20, 2004, and no monies were paid by
Chambers or disbursed by the Bank as disbursement on the SBA loan until the
contract amendment was signed.  Nothing
in the record indicates that the deed to the property was delivered to Chambers
June 28, 2004.[7]

            Conveyance
by deed requires delivery of the deed.  Tex. Prop. Code Ann. § 5.021 (Vernon
2004); Noell v. Crow-Billingsley Air Park
Ltd. P'ship, 233 S.W.3d 408, 415 (Tex. App.—Dallas 2007, pet. denied).  Delivery of a deed has two elements:  (1) the grantor must place the deed within the
control of the grantee (2) with the intention that the instrument become
operative as a conveyance.  Noell, 233 S.W.3d at 415.  The question of delivery of the deed is
controlled by the intent of the grantor, and it is determined by examining all
the facts and circumstances preceding, attending, and following the execution
of the instrument.  Id.  Here, the deed was not placed in Chambers’
control until July 20, 2004, when it was signed by the Bank.  Even if Chambers took possession of the
property June 28, there was no intention on the part of the Bank that the deed
become an operative conveyance until July 20, 2004, when Chambers deposited
$100,000.00 as a condition of the sale.

            These events
notwithstanding, we are nevertheless faced with the fact that Chambers, with
knowledge of the full scope of the problems with the septic system, signed a
contract amendment July 20, 2004, requiring the Bank to expend up to $32,000.00
to repair those problems.[8]  Chambers claims that, even if the contract
amendment somehow ratified the contract, the fraud found by the jury
nevertheless vitiates the deficiency recovery under the note, because there is
no finding of ratification that pertains to the note or any other document that
was signed June 28, 2004.  In the absence
of arguments or citations to the record or relevant legal authority, this
portion of Chambers’ argument is inadequately briefed and will not be
considered.  See Tex. R. App. P. 38.1(i);
LaCroix v. Simpson, 148 S.W.3d 731,
735 (Tex. App.—Dallas 2004, no pet.).

            Finally,
Chambers contends that continued performance under a contract constitutes
ratification only if the party has no continuing obligation to perform, citing Fortune Prod. v. Conoco , 52 S.W.3d 671,
679 (Tex. 2000).  In that case, Conoco
paid a premium to purchase the Concho Valley Gas System, including gas purchase
contracts.  The contract price for
residue gas exceeded the market price. 
Plaintiffs were producers of natural gas who were operating within the
Concho Valley Gas System under existing gas processing contracts.  When Conoco bought the plants and the
contracts, it terminated the old gas purchase contracts and entered into new
contracts with lower prices to the producers. 
The gas producers sued for fraud in the inducement on the new
contracts.  The court discussed the issue
of whether the ratification of a contract induced by fraud precluded the right
to sue for damages and recognized that, in some circumstances, a party induced
to enter a contract by fraud may ratify the contract in such a manner that a
claim for damages is foreclosed.  Id. at 676–79.  Those producers who continued to sell to
Conoco without a written contract (after having learned of the fraud) were not
entitled to sue for damages.  Those
producers who continued to sell to Conoco under a written contract were not
precluded from bringing a suit for damages. 
Id. at 676.

            This
distinction rests on a requirement to fulfill the terms of a written
contract.  Those producers selling
without written contracts delivered their gas and accepted payment.  They were not required to sell, and Conoco
was not required to purchase.  Those
producers who continued to sell to Conoco pursuant to written contracts with
Conoco which were induced by fraud did not, as a matter of law, foreclose their
right to sue for fraud damages.  Id. at 679.  

            We see no
application of the holding in Fortune
Production to the facts presented here. 
In the present case, a written contract for sale was amended in a very
precise manner designed to address the fraud issue about which Chambers
complained.  This is a classic case of
ratification whereby the obligations of the Bank and Chambers were adjusted
after Chambers learned of the fraud.  See Wise,
552 S.W.2d at 199.  In entering into the
amended contract with the Bank, Chambers acted in a way that recognized, in
spite of the revealed fraud, the existence of a binding contract.  See
Formosa Plastics Corp., USA, 216
S.W.3d at 456.  The evidence of
ratification is both legally and factually sufficient to support the jury’s
finding of ratification.[9]  We overrule this point of error.

(3)            The Trial Court Correctly
Disregarded the Jury’s Answers to all Questions Except Question Number Eight

 

            The jury
found in Chambers’ favor on claims of fraud, damages that resulted from the
fraud, and exemplary damages.[10]  The jury also found, however, that Chambers
ratified the contract.  The Bank filed a
post-trial motion for judgment on stipulated facts and in disregard of selected
jury answers, in which it urged the trial court to disregard the jury’s answers
to Questions 1, 2, 4, 5, 6, 7, and 10. 
The trial court granted the motion.[11]  The court’s final judgment specifically states
that the jury’s answers to the referenced questions “should be and are
disregarded,” but does not state the basis for this finding.  The court entered judgment in favor of the
Bank “on the remaining jury answers”[12] and
on the “stipulations of the parties.”[13] 

            A
trial court may disregard jury findings if they are unsupported by the evidence
or if they are immaterial.  Green Int’l v. Solis, 951 S.W.2d 384,
389 (Tex. 1997); Spencer, 876 S.W.2d at
157.   Because one of the bases set forth
in the Bank’s motion for judgment and in disregard of selected jury answers was
the affirmative ratification finding, the trial court was permitted to
disregard the jury findings if they were immaterial.  Spencer,
876 S.W.2d at 157.  A question is
immaterial when it should not have been submitted, calls for a finding beyond
the province of the jury, such as a question of law, or when it was properly
submitted, but has been rendered immaterial by other findings.  Se.
Pipe Line Co. v. Tichacek, 997 S.W.2d 166, 172 (Tex. 1999).  The Bank relies on the third ground.  A trial court may disregard a jury’s finding
on an immaterial issue and render judgment based on the remaining findings;
such a judgment is not considered as one rendered non obstante veredicto.  Anderson, Greenwood & Co. v. Martin,
44 S.W.3d 200, 216 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).  If the questions disregarded by the trial
court were immaterial, they were properly disregarded; otherwise, the trial
court had no authority to disregard same and the error may be reversible.[14]  Kuehnhoefer
v. Welch, 893 S.W.2d 689, 692  (Tex.
App.—Texarkana 1995, writ denied).

            The Bank
relies on the jury’s positive finding of ratification as the basis for its
claim that the jury questions disregarded by the trial court were immaterial.  When a party ratifies an agreement that has
been induced by fraud, the ratification generally vitiates the fraud,
precluding rescission or recovery of fraud damages.  See, e.g.,
Teders v. Mercantile Nat'l Bank, 235 S.W.2d 485, 488 (Tex. Civ. App.—Dallas
1950, writ ref’d n.r.e.).  Once a
contract has been ratified by a defrauded party, or a new agreement adjusting
the original fraudulent acts has been consummated, the defrauded party waives
any right of rescission or damages.  Wise, 552 S.W.2d at 200; see also Meyer v. Cathey, 167 S.W.3d 327 (Tex. 2005) (finding evidence of
ratification of fraud legally sufficient and rendering judgment that party who
ratified fraud take nothing on fraud claims). 
Here, the evidence of ratification is legally and factually sufficient.  Chambers’ ratification of the contract has
the legal effect of precluding recovery of fraud damages.[15]

            While
the jury determined the Bank committed fraud and real estate fraud against
Chambers and assessed damages and exemplary damages for that fraud, Chambers
ratified the fraud by entering into an amended contract that specifically
addressed the matter at the heart of the fraud—the faulty septic system at the
Lighthouse Resort.  Chambers’
ratification of the fraud precludes being awarded damages for that same
fraud.  Thus, the trial court correctly
disregarded the jury’s fraud and damage findings.  This point of error is overruled.

            We affirm
the judgment of the trial court.

 

 

 

 

                                                                                    Josh
R. Morriss, III

                                                                                    Chief
Justice

 

Date Submitted:          June
30, 2010

Date Decided:             July
29, 2010

 











[1]Chambers
agreed to purchase the property from the Bank for $685,000.00. 

 





[2]Chambers
would later learn that, even though David Coe, senior vice president of
Franklin National Bank (Bank) knew that sewage was being pumped from the septic
holding tank at the hotel, he never informed Chambers of this fact.  Coe was advised by the former owner of the
Lighthouse that the subcontractor who installed the septic system failed to
install the pump and the connecting line from the tank at the motel to the
system behind the convenience store.  

 





[3]The
resort consisted of a convenience store with gas pumps, a restaurant, and a
motel.  The resort was built on Lake Fork
in 2002 by Sharon Hale and her husband. 
After the untimely death of her husband, Hale was unable to run the
business and provided the mortgage holder, Franklin National Bank, with a deed
in lieu of foreclosure.  Thus, the Bank
had the resort in its inventory for a period approaching two years.





[4]The
amended contract provides, “[I]n addition to any repairs and treatments
otherwise required by the contract, Seller, at Seller’s expense, shall complete
the following repairs and treatments:  [I]nstallation
of system for waste water disposal for an allowance not to exceed $32,000.00.”

 

 





[5]Question
No. 8 reads:  “Was the contract in
question ‘ratified’ by Michael and Juliann Chambers?” 





[6]While,
as Chambers points out, many of the closing documents had been signed June 28,
no deed or bill of sale was signed until July 20.  It is clear, therefore, that closing did not finally
occur until July 20, the same date as the amendment, making that date the key
date for any ratification to have occurred and by which any knowledge by
Chambers must have been gained for ratification to have been effective.





[7]The
only evidence indicating Chambers ever wanted to “back out of the deal” was before
the time he learned of any problems with the septic system.  At that time, Chambers was informed that his
earnest money would not be returned.  

 





[8]The
jury was asked to determine whether the Bank promised to repair the septic
system with the intention of not fulfilling that promise (thereby committing
fraud).  The jury found that the Bank did
not commit fraud in making this promise. 


 





[9]While
Chambers did not brief this argument on appeal, in oral argument before this
Court Chambers contested ratification of the fraud because, while Charles was
aware of the problem with the septic system at the time he signed the contract
amendment, he was not aware that the Bank knew about the problem before the
sale and failed to inform him of the problem. 
Consequently, Chambers claims not to be “aware of the fraud,” and thus
not to have ratified it.  This argument
is disproved by the record.  At the July
20 meeting at the Bank, Paul Lester, senior vice president of the Bank, told
Charles personally that he was sorry, “we should have told you about [the
septic system], we know about it, it’s no big deal, there is a pipe missing and
we’re going to hook it up for you, no problem, no cost to you whatsoever, and
David knows about it, he’s already got a contractor to do it.”  

 





[10]The
jury answered “yes” to Questions 1 (fraud), 2 (real estate fraud), 4 (clear and
convincing evidence that Chambers was harmed by the fraud), and 5 (actual awareness
of the falsity of the representation or promise found to be real estate
fraud).  The jury returned damage
findings in answer to Questions 6 (damages that resulted from the fraud), 7
(special damages proximately caused by the fraud), and 10 (exemplary
damages).  The damages found by the jury—consideration
paid at the closing of the amended contract, attorney’s fees incurred in the
unsuccessful attempt to resist foreclosure, costs of septic pumping, and the
value of foreclosed inventory—all pertain to items incurred at or after the
closing of the amended contract.  The
Bank contends these items were not the result of fraud, but were a result of
proper performance and foreclosure under the amended contract, which Chambers
entered voluntarily after obtaining full knowledge of the facts and in exchange
for the Bank’s monetary concessions.

 





[11]The
Bank’s motion to disregard selected jury answers was based on (1) the jury’s
finding of ratification, whereby Chambers abandoned any claims for rescission
or damages and instead elected to accept the amended contract and
(2) claims of no evidence to support each such answer.

 





[12]The
remaining jury answers are to Question numbers 3 (no real estate fraud based
upon an alternate definition of real estate fraud), 8 (finding Chambers
ratified the contract), and 9 (Chambers did not waive claims of fraud against
the Bank).

 





[13]The
stipulations covered the amount of the deficiency owed to the Bank and the
Bank’s attorney’s fees.  

 





[14]This
statement assumes that all disregarded answers were otherwise supported by
sufficient evidence.

 





[15]Chambers’
contention of trial court error in disregarding the jury’s answers responds
only to that portion of the Bank’s motion to disregard the jury’s answers based
on the assertion that there is insufficient evidence to support those
findings.  Because we find the questions
disregarded by the trial court were rendered immaterial by the jury’s finding
on ratification, we do not address the sufficiency of the evidence in support
of the jury’s answers to those questions.